**COALITION OF NEW JERSEY SPORTSMEN, et al., Plaintiffs,**

v.

**James J. FLORIO, et al., Defendants.**

**Civ. No. 90–2992(GEB).**

United States District Court,
D. New Jersey.

Aug. 15, 1990.

---

Evan F. Nappen, Eatontown, N.J., for plaintiffs.

Robert J. Del Tufo, Atty. Gen. of N.J., Benjamin Clarke (argued), Deputy Atty. Gen., Dept. of Law & Public Safety, Trenton, N.J., for defendants.

## OPINION

GARRETT E. BROWN, Jr., District Judge.

Plaintiffs in this action [1] have brought suit against the Governor of New Jersey,

---

**1.** Plaintiffs are the Coalition of New Jersey Sportsmen, Inc.; the National Rifle Association of America; the Congress of Racial Equality; the New Jersey Firearms and Sporting Goods Dealers Association, Inc. and its president Robert Viden; Law Enforcement for Preservation of the Second Amendment, a non-profit organization; Preston K. Covey and David G. Mohler,

the Attorney General of New Jersey, the Superintendent of the New Jersey State Police, and the Prosecutor of Mercer County as prosecutor and as a representative of the class of county prosecutors in the State of New Jersey, seeking to strike down as unconstitutional portions of New Jersey's newly amended gun control law, N.J.S.A. 2C:39–1 *et seq.* The matter is now before the Court on a motion by plaintiffs for a preliminary injunction enjoining enforcement of the purportedly unconstitutional provisions. The Court has had the benefit of able, thorough, and helpful briefing and oral argument by counsel for both sides.

Plaintiffs raise three challenges to the statute. First, they challenge the newly enacted ban on large capacity magazines, N.J.S.A. 2C:39–3(j) (banning possession) and N.J.S.A. 2C:39–9(h) (banning manufacture, transport, shipment, sale, or disposal).[2] They contend that the law unconstitutionally criminalizes the possession or transfer of large capacity magazines without providing owners of such magazines an opportunity to conform with the new law before being subjected to its penalties. Second, they argue that the ban on large capacity magazines and regulation of semiautomatic, "assault firearms," N.J.S.A. 2C:39–5(f) (possession) and N.J.S.A. 2C:39–9(g) (manufacture, transport, shipment, sale or disposal), are preempted by federal law to the extent these provisions prohibit the sale of air guns and "traditional" B–B guns, in violation of 15 U.S.C. § 5001(g)(ii). Third, they contend that federal law providing for the interstate transport of unloaded, inaccessible firearms, 18 U.S.C. § 926A, preempts the newly amended law to the extent that the new law exposes to criminal prosecution people who transport weapons through New Jersey in accordance with the federal law.

The Attorney General has cross-moved for dismissal of all the above claims for failure to state a claim upon which relief may be granted. *See* Fed.R.Civ.P. 12(b)(6). In the alternative, and as to the first claim only, the Attorney General asks this Court to abstain under the doctrine enunciated in *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The Attorney General concedes that, under the Third Circuit's decision in *United Servs. Auto. Ass'n v. Muir*, 792 F.2d 356 (3d Cir.1986), *Pullman* abstention is inappropriate when a federal court is faced with questions of federal preemption under the Supremacy Clause. *See id.* at 363–64.

Before this Court may issue a preliminary injunction, plaintiffs must show a reasonable probability of success on the merits, and that they will suffer irreparable injury *pendente lite* if relief is not granted. The Court also must consider the possibility of harm to other interested persons from the grant or denial of the injunction, and the public interest. *In re Arthur Treacher's Franchise Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982). For the following reasons, the Court will abstain as to plaintiffs' first claim, grant preliminary injunctive relief on the second claim, and dismiss the third.

## I. THE LARGE CAPACITY MAGAZINE BAN

New Jersey's newly enacted ban on the possession, sale, manufacture, disposal, shipment, or transport of large capacity magazines became effective on March 30, 1990, the date Governor Florio signed the bill into law. Plaintiffs argue that, with the stroke of a pen, previously law-abiding owners of such magazines instantly became criminals without being given an opportunity lawfully to conform their conduct with the new law. Plaintiffs seek a preliminary injunction to protect themselves from the threat of prosecution.

The Attorney General contends that the immediate effective date of the large ca-

individual firearm owners who transport their guns through New Jersey; and various unnamed residents of New Jersey who own large capacity magazines.

2. The statute defines large capacity magazine as "a box, drum, tube or other container which is capable of holding more than 15 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm." N.J.S.A. 2C:39–1(y).

pacity magazine ban does not render the provision constitutionally infirm because New Jersey's voluntary surrender statute provides an opportunity for owners of such magazines lawfully to turn in such items without fear of prosecution. The statute provides:

> No person shall be convicted of an offense under this chapter for possessing any firearms, weapons, destructive devices, silencers or explosives, if after giving written notice of his intention to do so, including the proposed date and time of surrender, he voluntarily surrendered the weapon, device, instrument or substance in question to the superintendent or to the chief of police in the municipality in which he resides, provided that the required notice is received by the superintendent or chief of police before any charges have been made or complaints filed against such person for the unlawful possession of the weapon, device, instrument or substance in question and before any investigation has been commenced by any law enforcement agency concerning the unlawful possession. Nothing in this section shall be construed as granting immunity from prosecution for any crime or offense except that of the unlawful possession of such weapons, devices, instruments or substances surrendered as herein provided.

N.J.S.A. 2C:39–12.

Plaintiffs respond that the voluntary surrender statute is inadequate for three alternative reasons: 1) magazines are neither "firearms, weapons, destructive devices, silencers or explosives," the only items covered by the statute; 2) even if magazines were considered "weapons,"[3] the voluntary surrender provisions would immunize owners only from possessory offenses, not manufacture, shipment, disposal, transport, or sale, which are proscribed under N.J. S.A. 2C:39–9(h); and 3) even if owners of large capacity magazines could turn them in without fear of prosecution, the uncompensated voluntary surrender of such prop-

erty would result in an unconstitutional "taking" under the Fifth Amendment.

■ Before reaching the merits of these arguments, however, the Court first must consider whether to abstain. Although, as a general rule, the federal courts are bound to adjudicate cases within their jurisdiction, *Pullman* abstention is appropriate when "questions under both state law and the federal constitution are present," and abstention forwards the policies of "promoting comity with the state courts and ensuring the smooth functioning of the federal judiciary." *Hughes v. Lipscher*, 906 F.2d 961, 967 (3d Cir.1990). *Pullman* abstention also is appropriate where the state court's resolution of an unsettled question of state law may moot or change the analysis of the federal constitutional issue. *Georgevich v. Strauss*, 772 F.2d 1078, 1089 (3d Cir.1985) (en banc), *cert. denied*, 475 U.S. 1028, 106 S.Ct. 1229, 89 L.Ed.2d 339 (1986).

Although application of *Pullman* abstention is discretionary with the Court, the Third Circuit requires three special circumstances as prerequisites:

(1) Uncertain issues of state law underlying the federal constitutional claims brought in the district court;

(2) Amenability of the state law issues to a state court interpretation that would obviate the need for, or substantially narrow, adjudication of the federal claims; [and]

(3) Disruption of important state policies through a federal court's erroneous construction of state law.

*Hughes*, at 968. Once these elements are present, a district court must next determine "whether abstention is appropriate, considering such factors as the availability of an adequate state remedy, the length of time the litigation has been pending, and the potential impact on the parties from the delay in seeking a state ruling." *Id.*

All the factors in favor of *Pullman* abstention are present in regard to plaintiffs' claim regarding the large capacity maga-

---

**3.** Weapons are defined under N.J.S.A. 2C:39–1(r) as "anything readily capable of lethal use or of inflicting serious bodily injury. The term includes, but is not limited to ... (2) components which can be readily assembled into a weapon...."

zine ban. First, the uncertain issue of state law underlying the constitutional claim is the interaction between the voluntary surrender statute and the ban on large capacity magazines. The New Jersey courts have not had the opportunity to interpret either statute, alone or in combination. Second, state court interpretation of these statutes will materially alter this Court's constitutional analysis. If the state court interprets the voluntary surrender statute as not providing a remedy for large capacity magazine owners, this Court must consider whether the statute is constitutionally deficient for insufficient notice. If the state court interprets the voluntary surrender statute to the contrary, this Court must determine whether such a remedy effects an unconstitutional taking, rather than a valid exercise of the police power. Third, gun control and regulation is an important state policy that would be disrupted if this Court were to construe state law erroneously.

Other factors also favor abstention at this time. At oral argument, defendants indicated that they will move promptly to seek a decision in the state courts, and there is no indication that those courts would not promptly and adequately resolve the questions presented. The present action has been pending for only a few weeks, and the Court does not foresee any potential adverse impact on the parties from a reasonable delay in seeking a state ruling. The Attorney General has taken the position in open court that N.J.S.A. 2C:39–12 does in fact provide for the voluntary surrender of large capacity magazines and this Court has no reason to anticipate that the chief law enforcement officer of the State of New Jersey would change his position and authorize prosecution of those individuals who voluntarily surrendered such magazines for the possession thereof. Moreover, any claimed uncompensated "taking" as a result of voluntary surrender could not be irreparable because, even assuming such a taking was not a valid exercise of the police power, plaintiffs could be made whole through monetary compensation.

Plaintiffs assert that the immunity provided by the voluntary surrender statute is inadequate because it would not immunize them from prosecution for manufacture, sale, disposal, shipment, or transport of large capacity magazines. Were the State to attempt to prosecute plaintiffs for manufacture, sale, or transport of such items based solely upon a voluntary surrender pursuant to the statute, the scope of the state immunity, and any constitutional questions presented thereby, would best be resolved in the state forum, and are too speculative to be dealt with here.

## II. FEDERAL PREEMPTION RE: B–B AND AIR PELLET GUNS

◼ Plaintiffs correctly assert that the New Jersey statute's definition of semi-automatic shotguns may include certain B–B and pellet-firing air guns. New Jersey law defines a shotgun as, among other things, "any firearm designed to be fired from the shoulder which does not fire fixed ammunition." N.J.S.A. 2C:39–1(n). B–B guns and pellet-firing air guns fall within the statutory definition of firearms. See N.J.S.A. 2C:39–1(f). Also, neither B–B nor pellet-firing air guns fire fixed ammunition—i.e., ammunition encased in an explosive cartridge which propels the round. Thus, semi-automatic B–B and pellet-firing air guns designed to be fired from the shoulder and which have either a magazine of more than six rounds, a pistol grip, or a folding stock, would be classified as assault firearms under N.J.S.A. 2C:39–1(w)(3). Moreover, any semi-automatic B–B or pellet guns that had non-detachable magazines in excess of fifteen rounds would fall within the statutory definition of large capacity magazines. See N.J.S.A. 2C:39–1(y).[4]

The relevant inquiry, therefore, is whether the language in 15 U.S.C. § 5001(g), that

---

**4.** If the magazines were detachable and not an integral part of a firearm not otherwise regulated under the New Jersey statute, then only the magazine would be banned, not the firearm.

The ban on large capacity magazines in such instances would not be preempted under § 5001(g), as such magazines are neither traditional B–B, paint-ball, or pellet-firing air guns.

"no state shall—(ii) prohibit (other than prohibiting the sale to minors) the sale of traditional B–B, paint-ball, or pellet-firing air guns that expel a projectile through the force of air pressure," conflicts with the New Jersey statute. At the outset, it is important to understand the distinction between B–B guns and air-powered pellet guns.[5] "B–B" refers to the smallest calibre of shot. The B–B is ball-shaped, and made of lead, lead alloy, or steel. B–Bs need not be propelled by air: they may, for instance, be propelled by a spring mechanism. It appears that B–Bs generally are fired from smoothbore barrels. In contrast, a pellet may be one of three higher calibres, .117 cal., 5 mm, or .22 cal. The pellet is a nonspherical, semi-hollow projectile made of lead or lead alloy. When fired from an air gun, the gases in the barrel cause the pellet to expand and grip the rifling in the barrel. The rifling causes the pellet to spin and thereby produces a more accurate shot than the B–B. Thus, the term "B–B gun" refers only to the calibre and type of projectile the gun fires, whereas a "pellet-firing air gun that expel[s] a projectile through the force of air pressure" refers not only to the projectile, but to the means of propelling it.

The defendants argue that the word "traditional" must be read as modifying B–B, paint-ball, *and* pellet-firing air guns, despite the use of the disjunctive "or" in the statute. They further contend that, in using the word "traditional," the Congress meant to refer only to single-shot B–B and pellet-firing air guns, not semi-automatic ones. However, the statute's plain language, legislative history, and subsequent interpretation by the Department of Commerce suggests a contrary construction.

The most apparent contradiction in defendants' position can be found in the express language of the statute. For the term "traditional" to modify both B–B and pellet-firing air guns, the term logically must also apply to paint-ball guns. According to the Congressional Record, paint-ball guns fire "projectiles for marking trees, or paintball games or other similar purposes." 134 Cong.Rec. S15531 (daily ed. October 11, 1988) (statement of Sen. Dole); 134 Cong. Rec. H10071 (daily ed. October 12, 1988) (statement of Rep. Dingell). Such devices are of comparatively recent origin and plaintiffs have asserted without opposition that there are no "traditional" paint-ball guns, and that those used for paintball games are a relatively new development.[6]

The strongest indicia of congressional intent, however, are § 5001's enabling regulations established by the Department of Commerce at 15 C.F.R. § 1150.1—1150.5.[7] In 15 C.F.R. § 1150.1, Commerce interprets "traditional B–B, paint-ball, or pellet-firing air guns" as those guns that are described in American Society for Testing and Materials standard F 589–85, *Standard Consumer Safety Specification for Non–Powder Guns* (June 28, 1985). Section 1.1, which defines the scope of the specifications, expressly covers "non-powder guns, commonly referred to as BB guns, air guns, and pellet guns, which propel a projectile by means of energy released by compressed air, compressed gas, mechanical

**5.** The following definitions derive from American Society for Testing and Materials ("ASTM") Standard F 589–85, *Standard Consumer Safety Specification for Non–Powder Guns* (June 28, 1985), incorporated by reference in 15 C.F.R. § 1150.1, as well as ASTM Standard F 590–84, *Standard Consumer Safety Specification for Non–Powder Gun Projectiles and Propellants* (reapproved 1989), referenced in ASTM F 589–84 § 2.1. *See also Toy Guns: Involvement in Crime & Encounters With Police*, U.S. Justice Dept. Bureau of Justice Statistics (June 1990), a research project mandated by the United States Congress P.L. 100–615 [15 U.S.C. § 5001(c) ].

**6.** Neither party asserts that the federal preemptive provision concerning paint-ball guns is implicated here. Such guns do not appear to be covered by the New Jersey statute which defines a "weapon" as "anything readily capable of lethal use or of inflicting serious bodily injury." N.J.S.A. 2C:39–1(r). As the comments of Rep. Dingell make clear, the paint-ball guns excluded from state regulation include those for marking trees and for playing paintball games, activities which apparently do not, and are designed not to, create a risk of serious bodily injury or death.

**7.** Department of Commerce regulations are afforded great deference in statutory interpretation. *Cf. Helvering v. Winmill*, 305 U.S. 79, 59 S.Ct. 45, 83 L.Ed. 52 (1938).

spring action, or a combination thereof...." *Id.* In adopting this definition, Commerce thereby gave a very broad reading to the preemptive provisions of § 5001(g), for section 1.1 appears to cover *all* B–B and pellet guns, so long as the guns do not use gunpowder to propel their rounds. Commerce's interpretation is reasonable, and the defendants have provided no evidence to the contrary.[8]

Further support for this interpretation may be found in the legislative history of § 5001. The Senate introduced § 5001 as an amendment to the House amendments to Senate Bill 1382, the Federal Energy Management Improvement Act. The amendment, entitled "Penalties for Entering Into Commerce of Imitation Firearms," required that toy, look-alike or imitation firearms have a blaze orange plug affixed in their barrels recessed no more than 6 millimeters from the muzzle end of the barrel.[9] The bill was introduced on the impetus of the Hobby and Toy Industry of America and the Toy Manufacturers of America. 134 Cong.Rec. S15531 (daily ed. October 11, 1988) (statement of Sen. Dole).[10] The purpose of the bill was expressed in the House debate:

> The potential hazards and misuses of an object that resembles a deadly weapon ought to be evident to everyone. A person threatened with such an object can scarcely conduct a detailed examination to determine whether it is in fact real. Similarly, a police officer can hardly be expected to make a detailed inquiry concerning just how real the object in the hands of an adversary is before firing his gun. For these reasons, misuse of toy guns presents a real hazard and a problem that needs to be addressed.

134 Cong.Rec. H10071 (daily ed. October 12, 1988) (statement of Rep. Moorhead).

Express reference as to the meaning of the terms "traditional B–B, paint-ball, or pellet firing air gun" appears in the statement of Senator Dole of Kansas:

> B–B or pellet firing air guns such as those made by the Daisy Manufacturing Co. and Crosman air guns are also exempted. Similarly, the provision does not intend that paint-pellet guns firing projectiles for marking trees, or paintball games or other similar purposes such as those manufactured by the Nelson Paint Co. be covered.

134 Cong.Rec. S15531 (daily ed. October 11, 1988) (statement of Sen. Dole); *accord*, 134 Cong.Rec. H10071 (daily ed. October 12, 1988) (statement of Rep. Dingell). These comments expressly identify Daisy B–B guns and air guns, as well as Crosman air guns, as examples of guns exempt from state regulations prohibiting their sale. In the absence of any contrary indicia of congressional intent, it appears that the exception carved out for air guns applied, *inter alia*, to *all* air guns made by Daisy and Crosman at the time the legislation was enacted.

Defendants have submitted the affidavit of Peter Harvey, Special Assistant Attorney General, who avers that Daisy and Crosman representatives indicated to him that, with one exception, none of their air-powered or B–B rifles are semi-automatic. In opposition, plaintiffs have submitted recent catalog advertisements for various semi-automatic air rifles, albeit rifles manufactured by companies other than Crosman or Daisy,[11] as well as semi-automatic pis-

---

8. While one may suggest that Commerce's reading was overly expansive in that standard F 589–85 arguably covers "non-traditional" as well as "traditional" B–B guns, this Court does not have before it any evidence from which such a distinction can be made, and does not consider the argument at this time.

9. The statute provides an exception for "any look-alike, nonfiring, collector replica of an antique firearm developed prior to 1898, or traditional B–B, paint-ball, or pellet-firing air guns that expel a projectile through the force of air pressure." 15 U.S.C. § 5001(c).

10. These organizations apparently supported this bill in preference to one introduced by Representative Levine of California, H.R. 3433, which would have banned such devices altogether.

11. Such firearms include the Air Arms Firepower K–Carbine Standard Air Rifle, a weapon modelled after the M–16 assault rifle, that comes available with a 35–shot auto-load system. From 1987 to 1988, Crosman manufactured and sold its Z–77, a carbon-dioxide-powered replica of the Uzi submachine gun.

tols with magazines in excess of fifteen rounds. Some of these pistols are made by Crosman and Daisy,[12] and would be banned under New Jersey's prohibition on large capacity magazines. The Court finds, therefore, that the Congress intended to remove from the states the power to prohibit the sale of such B–B and air-powered pellet guns as are covered under the New Jersey statute.

Having determined that the New Jersey statute regulates a class of firearms that falls within the preemptive provisions of § 5001(g), the Court next considers whether the statute constitutes a prohibition on the sale of such firearms. In the case of semi-automatic air pistols with a non-detachable magazine exceeding fifteen rounds, the prohibition is express. In the case of a person wishing to purchase semi-automatic air rifles classified as assault firearms under N.J.S.A. 2C:39–1(w)(3), the prohibition is *de facto*, for that person must go through the extremely rigorous qualification process required for receiving a license to own a machine gun.

To receive a license for air rifles fitting the definition of semi-automatic shotguns, the applicant first must be qualified to carry a handgun under N.J.S.A. 2C:58–4.[13] The applicant then must file with the New Jersey Superior Court a written application, setting forth in detail the reasons for desiring such a license. The Superior Court thereafter refers the application to the county prosecutor for investigation and recommendation. Based upon the recommendation, the Superior Court may grant the license only upon an express finding that the public safety and welfare so require. The Superior Court also may place any conditions and limitations on the license as it deems in the public interest. Applicants must pay a $75 application fee with each application. Any issued license may be valid. for no more than two years. Once the license expires, the applicant must reapply as if he or she were applying for the first time. *See* N.J.S.A. 2C:58–5.

These restrictions are so substantial that they create a *de facto* prohibition on the sale of B–B and air guns that may fall under New Jersey's statutory definition of semi-automatic firearms. Any potential owner must qualify under two lengthy application procedures, and may be refused at any time the State determines such a license does not serve the public interest. This regulatory scheme vests unbridled discretion over the licensing process with the State.

In sum, plaintiffs have carried their burden of showing that New Jersey's ban on large capacity magazines and regulation of semi-automatic assault weapons are preempted by federal law to the extent they prohibit the sale of traditional B–B and pellet-firing air guns. Plaintiffs also have demonstrated the possibility of irreparable injury, because owners of such firearms and large capacity magazines face the threat of prosecution. Moreover, the public interest is served in ensuring that congressional regulation of interstate commerce supercedes conflicting and contradictory state regulations. Finally, there is no suggestion of inequitable conduct by plaintiffs, or that granting plaintiffs such an injunction would in any way be ineq-

12. Examples of such pistols include the Crosman 338 Auto Pistol, an air-powered B–B pistol with a 20–shot magazine and the Daisy/Youth Line Model 1500 Pistol, a B–B pistol with a 60–shot reservoir and a gravity feed magazine.

13. To qualify for a permit to carry a handgun under this provision, the applicant must fill out an application, and have it endorsed by three reputable persons who have known the applicant for at least three years preceding the date of application. The applicant then must be fingerprinted by the chief police officer in the municipality where he or she resides and must give the police chief a complete description of each handgun he or she intends to carry. Appli-

cants who have been convicted of a crime, who suffer from drug addiction, mental illness, alcoholism, or from any disability that makes it unsafe to handle firearms, or who are under the age of eighteen, or who, in the state's discretion, pose a risk to the public health, safety or welfare, may not receive such a license. If the applicant does not fall into one of these prohibited categories, he or she may be entitled to a permit if he or she is "thoroughly familiar with the safe handling and use of handguns, and ... has a justifiable need to carry a handgun." If a license is issued, the applicant must pay a permit fee of $20. N.J.S.A. 2C:58–4.

uitable. Accordingly, plaintiffs are entitled to preliminary injunctive relief. *See Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

The Court is well aware of the ramifications of its findings. The Congress, while attempting to reduce the commission of crimes with toy guns, has removed from the states the ability to prohibit the sale of more dangerous, high-powered air guns, some of which appear capable of inflicting serious bodily injury or death. There is no dispute that the Congress may exercise such power under the Commerce Clause however, and the wisdom or desirability of such an exercise is an issue for the Congress and not this Court.

## III. FEDERAL PREEMPTION RE: INTERSTATE TRANSPORTATION OF UNLOADED, INACCESSIBLE WEAPONS

██ Plaintiffs Covey and Mohler contend that the recent amendments to New Jersey's gun control law are preempted by the federal statute providing for the interstate transportation of firearms. 18 U.S.C. § 926A. The federal statute provides, in essence, that anyone may transport firearms from one state in which they are legal, through another state in which they are illegal, to a third state in which they are legal, provided the firearms are transported in a prescribed, safe manner.[14] Plaintiffs argue that, under the recent amendments, they may be arrested for transporting firearms through New Jersey, even though they have complied with the federal statute. In support, they rely on the affidavit of the police chief of Lebanon Township, in which he avers:

I am aware that there is some federal law that provides an exception whereby interstate travellers may travel with an unloaded gun locked in their trunk, but so far as I am aware, that would not make them any less subject to arrest in New Jersey either under the new Act or under previous New Jersey gun laws. If the federal law provides them some sort of defense, that is up to the prosecutor and/or judge in the court in which they are arraigned.

Aff. of Harry C. Creveling at ¶ 5.

The Attorney General argues that the federal law does not preempt state gun control laws, and that, consequently, there is no conflict between § 926A and the new amendments. The Attorney General further argues that, although the new statute does not have a provision expressly recognizing that the statute is subject to preemption by federal law, no such requirement is needed, as the Constitution's Supremacy Clause provides such a guarantee.

The Attorney General's position on this point is persuasive. A straightforward reading of § 926A demonstrates that the statute prohibits only regulation of the interstate transport of firearms, and in no way restricts a state's power to regulate firearms within the state. *See Oefinger v. Zimmerman*, 601 F.Supp. 405, 412 (W.D. Pa.1984), *aff'd*, 779 F.2d 43 (3d Cir.1985). Indeed, in § 927, the Congress clearly expressed its intent not to occupy the field of intrastate gun control regulation:

No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that

14. The statute provides in full:

Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm if,

during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle: *Provided*, That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container other than the glove compartment or console.
18 U.S.C. § 926A.

the two cannot be reconciled or consistently stand together.

18 U.S.C. § 927. The Court sees no conflict between § 926A and New Jersey's recently amended gun control law. The risk that a person transporting firearms in accordance with § 926A will be arrested in New Jersey for possessing an illegal firearm or magazine is the same risk that person encounters whenever he or she drives through a state where such weapons are illegal. For plaintiffs' predicted irreparable injury to become realized, law enforcement officers throughout New Jersey would have to disregard the federal law in its entirety. The threat of such arguably random and unauthorized acts is speculative at best, and does not constitute irreparable injury, the Lebanon police chief's affidavit notwithstanding.[15] Moreover, the Court is aware of no requirement that the New Jersey law must contain an express acknowledgement of the Supremacy Clause and preemptive legislation in order to pass constitutional muster. Accordingly, plaintiffs' interstate transportation claim must fail as a matter of law, and will be dismissed. An order consistent with this opinion will be entered.

### ORDER

For the reasons set forth in this Court's opinion filed this day, August 15, 1990;

IT IS ORDERED that the Court does hereby abstain from decision under *Railroad Comm'n of Texas v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), as to the first claim of plaintiff's complaint, until such time that either party can demonstrate that the underlying issues of state law have been resolved in the first instance by the New Jersey state courts, or that further abstention is otherwise unwarranted; and it is

FURTHER ORDERED that plaintiffs' motion for a preliminary injunction be and is hereby granted in part; and it is

FURTHER ORDERED that defendants, their employees, officers, and/or agents be

and are hereby preliminarily enjoined from enforcement of or prosecution under, N.J. S.A. 2C:39–3(j), and N.J.S.A. 2C:39–9(h) against any and all owners of semi-automatic B–B or pellet-firing air guns whose guns contain non-detachable magazines in excess of fifteen (15) rounds; and it is

FURTHER ORDERED that defendants, their employees, officers, and/or agents be and are hereby preliminarily enjoined from enforcement of, or prosecution under, N.J. S.A. 2C:39–5(f) and N.J.S.A. 2C:39–9(g) against any and all owners of semi-automatic B–B or pellet-firing air guns whose guns are designed to be fired from the shoulder, and have either a magazine capacity in excess of six (6) rounds, a folding stock, or a pistol grip; and it is

FURTHER ORDERED that plaintiffs' motion for a preliminary injunction be and is hereby denied in all other respects; and it is

FURTHER ORDERED that plaintiffs' interstate travel claim be and is hereby dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

---

**15.** Based on the police chief's affidavit, plaintiffs arguably could seek a preliminary injunction against him. The police chief, however, is

not a named defendant, and therefore this issue is not before the Court.