Freddie **HAMILTON,** Administratrix of the Goods, Chattels and Credits of Njuzi Ray, deceased; Freddie Hamilton, Individually, Katina Johnstone, Administratrix of the Goods, Chattels and Credits of David Johnstone, deceased; Katina Johnstone, Individually, Plaintiffs,

v.

**ACCU–TEK,** American Arms, Inc., American Derringer, A.M.T., Armsco Distributing Co., d/b/a Armsco Distributor, Arms Corporation of America, Arms Technology, Astra–Unceta Y CIA, S.A., Beretta Firearms, Beretta U.S.A. Corp., Browning Arms Co., Bryco Arms, Calico Inc., Caspian Arms, Inc., Century International Arms, Inc., Charco, f/k/a Charter Arms Corp., Colt Industries Operating Corp., Colt's Mfg. Co., Inc., Davis Industries, Inc., European American Armory, d/b/a E.A.A. Corp., Emco, Inc., Excam, Inc., Freedom Arms Co., Firearms Import and Export Corp., Glock, Inc., Grendel, Inc., H & R 1871 Inc., f/k/a/ Haskell Mfg. Inc., Harrington and Richardson, International Armament Corp.,

**1308**

d/b/a Interarms Industries, Inc., International Distributors, Inc., Jennings Firearms, Inc., K.B.I. Inc., Llama Gabilondo Y CIA S.A., Lorcin Engineering Co., Marlin Firearms Inc., Mitchell Arms Inc., Navegar Inc., New England Firearms Inc., f/k/a Harrington and Richardson, Para Ordnance Mfg. Inc., Phoenix Arms, Inc., R.G. Industries, Inc., Ram-Line Corp., Remington Arms Co., Savage Arms Corp., Seecamp, Smith and Wesson, Inc., Stosseger Industries, Sturm, Ruger and Co., Inc., S.W. Daniels Incorporated, Taurus International Firearms Inc., Thompson/Center Arms, U.S. Repeating Arms, Wesson Firearms Co., f/k/a Dan Wesson Arms, Defendants.

No. CV–95–0049.

United States District Court,
E.D. New York.

Aug. 12, 1996.

**1312**

Elisa Barnes, New York City, for Plaintiffs.

Robert L. Joyce, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, John Renzulli, Renzulli, Gaines & Rutherford, New York City, for Defendants Accu-tek, A.M.T., Browning Arms Co., Caspian Arms Co., Davis Industries, Inc., European American Armory, Freedom Arms Co., Glock Inc., H & R 1871 Corp., K.B.I. Corp., Mitchell Arms Inc., Navegar Inc., Para–Ordnance Mfg. Inc., Sigarms, Inc., Springfield, Inc., Stosseger Industries, Thompson/Center Arms Co.

Daniel T. Hughes, Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, New York City, for Defendant American Arms Inc.

Timothy A. Bumann, Christopher J. York, Cozen and O'Connor, Atlanta, GA, for Defendants American Derringer, Bryco Arms, Calico Inc., Excam Inc., Firearms Import and Export Corp., Jennings Firearms Inc., Lorcin Engineering Co., Phoenix Arms, Inc., S.W. Daniels Inc., Taurus International Firearms Inc.

Michael J. Sommi, Cozen and O'Connor, New York City, for Defendants A.M.T., Bryco Arms, Calico Inc., Excam Inc., Lorcin Engineering Co., Taurus International Firearms Inc., Thompson Center Arms.

Patricia Fried Moores, Pino & Associates, White Plains, NY, for Defendants Beretta Firearms, Beretta U.S.A. Corp.

Peter James Johnson, Jr., Leahey & Johnson, P.C., New York City, for Defendant Century International Arms Inc.

Timothy Atwood, Ansonia, CT, for Defendant Charco.

Anne Giddings Kimball, Wildman, Harrold, Allen, Dixon & Smith, Chicago, IL, for Defendants Colt Industries Operating Corp., Colt's Mfg. Co., Inc., Marlin Firearms Inc., Remington Arms Co., Seecamp, Smith and Wesson Inc., Sturm, Ruger and Co., Inc.

Steven Jay Harfenist, Carroll & Harfenist, New York City, for Defendant S.W. Daniels, Inc.

### AMENDED MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION .................................................... 1313
II. FACTS AND PROCEDURAL HISTORY ................................. 1314
 A. Pleadings .................................................. 1314
 B. Procedural History ......................................... 1315
 C. Facts Elicited During Discovery ............................ 1315
 1. Membership in Trade Associations ..................... 1315
 2. Lobbying Activity .................................... 1315
 3. Marketing and Distribution ........................... 1316
III. Constitutional and Statutory Limits on Plaintiffs' Claims ......... 1316
 A. First Amendment .......................................... 1316
 B. Second Amendment ........................................ 1317
 C. Statutory and Regulatory Scheme .......................... 1318
 1. Preemption of State Tort Law ......................... 1319
 2. Effect of Statutory Scheme on Duties Under State Tort Law ......... 1320
 D. Application ................................................ 1321
 1. First Amendment ..................................... 1321
 2. Second Amendment ................................... 1321
 3. Preemption .......................................... 1321
 4. Effect of Federal Statute on State Tort Duties ........ 1321
IV. Law of Product Liability ....................................... 1321
 A. Generally ................................................. 1322
 B. Treatment of Guns Under Product Liability ................. 1322
 C. Ultrahazardous Activity ................................... 1323

D. Application of Law to Facts ........................................ 1324
V. Fraud ................................................................... 1324
 A. Law of Fraud ..................................................... 1324
 B. Application ....................................................... 1325
VI. Collective Liability .................................................. 1325
 A. Applicable Law ................................................... 1325
 B. Choice-of-Law .................................................... 1325
 1. New York's Choice of Law Principles ......................... 1325
 2. Application ................................................. 1325
 C. Law of Summary Judgment ....................................... 1326
 D. Law Applicable to Collective Liability .......................... 1327
 E. Application of Law to Facts ..................................... 1329
VII. Class Action Certification .......................................... 1331
 A. Requirements ..................................................... 1331
 B. Application ....................................................... 1332
VIII. Conclusion .......................................................... 1332

## I. INTRODUCTION

Defendants have moved for summary judgment. Because discovery is not fully developed and plaintiffs appear to be unsure of their substantive legal theory and its factual underpinnings, much of this memorandum must be tentative and hypothetical. Nevertheless, enough has been shown and suggested by plaintiffs to make dismissal premature.

Plaintiffs are representatives of people who were shot and killed by individuals who illegally obtained handguns. They seek compensation in tort for the killings. Defendants are manufacturers of handguns. Plaintiffs also seek certification of a class action under Rule 23(c)(4)(A) on the limited question of defendants' liability for alleged joint conduct or concerted action. Certification at this stage is not warranted.

Plaintiffs sue on a mass tort theory, analogizing handguns and their ammunition to a pathogen leading to latent injuries and the deaths of many thousands of people, much like claims associated with asbestos, agent orange, the dalkon shield, and silicone gel breast implants. *See, e.g.,* Deborah R. Hensler, *The Use of Alternative Dispute Resolution in Mass Personal Injury Litigation,* 73 Tex.L.Rev. 1587, 1595–97 (1995) (describing characteristics of mass torts); *cf.* Note, Absolute Liability for Ammunition Manufacturers, 108 Harv.L.Rev. 1679, 1681–82 (1995) (ammunition as pathogen). They point to statistics such as these: Each year, more than 600,000 firearm crimes are reported in the United States; the number of violent attacks involving firearms increased 55% between

1987 and 1992; about 1.3 million Americans faced assailants armed with guns in 1993; among people aged 15–25, one of every four deaths were by firearm; and gun-related homicides by juvenile offenders more than doubled between 1984 and 1992. *See* United States Department of Justice, Bureau of Justice Statistics, *Firearms and Crimes of Violence: Selected Findings From National Statistical Series* 3, 11, 13 (1994); Alfred Blumstein, *Youth Violence, Guns, and the Illicit Drug Industry,* 86 J.Crim.L. & Criminology 10, 24–26 (1994); Lois A. Fingerhut, Centers for Disease Control and Prevention, *Firearm Mortality Among Children, Youth, and Young Adults 1–34 Years of Age, Trends and Current Status: United States 1985–90* 1 (1993); *Crimes Involving Handguns Rose in 1993, Report Shows: Semiautomatic Use in Juvenile Crime Is Up,* N.Y.Times, Jul. 10, 1995, at A10; *see also Children Carrying Weapons: Why the Recent Increase: Hearings Before the Comm. on the Judiciary,* 102d Cong., 2d Sess. (1992). The medical community recognizes the problem as almost a pandemic. *See, e.g.,* Arthur L. Kellerman, *Annotation: Firearm–Related Violence— What We Don't Know Is Killing Us,* 84 Am.J.Pub. Health 541 (1994) ("Firearm-related deaths are a major public health problem in the United States."); Mark L. Rosenberg, National Center for Injury Prevention and Control, *Presentation: Violence Prevention* (1994) ("Violence is a public health problem."); Charles S. Browning, *Handguns and Homicide: A Public Health Problem,* 236 JAMA 2198 (1976) (epidemiology ranking

handgun homicides just below lung cancer as a cause of death for persons under 65).

Plaintiffs point to the ease with which minors and criminals are able to obtain handguns despite restrictive state and federal laws as an indication that defendants are marketing handguns in a negligent fashion. *See, e.g.,* Joseph P. Sheley & Victoria E. Brewer, *Possession and Carrying of Firearms Among Suburban Youth,* 110 Pub. Health Rep. 18 (1995) (finding significant percentage of automatic or semiautomatic handgun possession); Charles M. Callahan & Frederick P. Rivara, *Urban High School Youth and Handguns: A School–Based Survey,* 267 JAMA 3038 (1992) (thirty-four percent of students surveyed reported easy access to handguns); United States Department of Justice, Bureau of Justice Statistics, *Firearms and Crimes of Violence: Selected Findings From National Statistical Series, supra,* at 11 (showing extent to which criminals purchase guns from sources other than licensed retail dealers because of effectiveness of background checks); *see also* James M. McKinley, *Dealer Accused of Selling Guns to Criminals,* N.Y.Times, Jun. 22, 1995, at B3 (noting role of licensed gun dealers in gun sales to criminals).

By contrast, defendants point out that they are manufacturing and selling a lawful product in compliance with federal and state statutes and regulations governing the distribution of firearms. They contend that they should not be blamed for abuse of that product any more than manufacturers of cars, kitchen knives or axes are blamed when these useful and lawful instruments have been used to commit crimes.

The issues posed are novel. They are not easily resolved using well-established state substantive and procedural law. *See* Part VI.A, *infra,* on applicability of state law to plaintiffs' claims.

For the reasons stated below, defendants' motions to dismiss are granted with respect to the product liability and fraud claims, but not on the questions of collective and individual liability for possible negligence in merchandising handguns in a dangerous manner. Further factual development is required.

*See* Part VI.C, *infra,* on the law of summary judgment.

## II. FACTS AND PROCEDURAL HISTORY

### A. Pleadings

Plaintiff Freddie Hamilton is the mother of Njuzi Ray and the administrator of his estate. Njuzi Ray was shot and killed on July 27, 1993. The gun was never recovered, but police investigators have determined, based on spent bullet cases found at the crime scene, that the gun used to kill Njuzi Ray was probably either a Beretta or Taurus 9 millimeter handgun.

Katina Johnstone is the widow of David Johnstone and the administrator of his estate. David Johnstone was shot and killed with a stolen Smith & Wesson revolver. The gun was found at the crime scene and traced to Stephen Mashney, who lawfully owned the gun and who had reported it stolen after his house had been burglarized two weeks before the shooting. The shooter has been identified and convicted. Defendants in this action have traced a chain of lawful possession back to the original sale by Smith & Wesson to International Distributors, Inc. in Miami, Florida.

Forty-nine firearm manufacturers who sell or distribute handguns in the United States are defendants. Three firearm manufacturers who were originally named as defendants have been dismissed without prejudice by agreement of the parties. Neither those who fired the handguns nor other handgun dealers or owners in the chain of possession between the manufacturer and the shooters are sued.

Plaintiffs alleged seven causes of action in the complaint. The first four causes of action seek to hold defendants liable for negligence on the theory that defendants all market handguns in a manner that fostered the growth of a substantial underground market in handguns. The existence of this illicit gun market, it is claimed, enables youths to buy handguns easily and contributes greatly to the problem of handgun-related violence in American society. The fifth and sixth causes of action seek to hold defendants liable under

theories of design defect and ultrahazardous activity. The seventh cause of action alleges that defendants defrauded federal officials to prevent more stringent regulation of handguns.

The court has granted plaintiffs leave to amend their complaint in order to add up to twenty-eight additional plaintiffs. The exact gun and the circumstances through which the shooter came to possess it will apparently be identified with regard to the shootings of only some of the individuals whose cases will be represented.

## B. Procedural History

Plaintiffs Hamilton and Johnstone filed this civil action in January 1995. A number of defendants moved jointly for summary judgment in April 1995. After oral argument in June, the court granted part of defendants' motion by dismissing plaintiffs' claims brought under theories of product liability. The reasons for that decision are explained in this opinion. Based on the argument, the court permitted plaintiffs to proceed with a negligence claim. The court granted plaintiffs limited discovery on mechanisms in place within the handgun industry for concerted activity on matters of mutual interest. Discovery thus far has been limited to industry-wide efforts to thwart legislation or regulation affecting the distribution of handguns.

Upon completion of plaintiffs' discovery, defendants filed new motions for summary judgment. They argue in effect that summary judgment is warranted because no theory of individual or collective industry-wide liability can be supported by the evidence elicited or discoverable. This memorandum is addressed primarily to these most recent motions.

In addition, plaintiffs have sought class certification under Rule 23(c)(4)(A) of the Federal Rules of Civil Procedure. Plaintiffs propose that the class consist of individuals killed through the illegal use of handguns and that it be certified only for resolution of the limited question of defendants' liability under a concerted action or joint conduct theory. They argue that the interests of judicial economy and efficiency and fairness to the litigants are best served by class certi-

fication on this point. The reason certification is inappropriate at the present stage of the litigation is also addressed below.

Issues relating to the underlying negligence theory embodied in the first four causes of action in plaintiffs' complaint have not been subject to full discovery and have not been fully briefed. This memorandum does not, therefore, dispose of the negligence claims as part of the summary judgment motion.

## C. Facts Elicited During Discovery

Pursuant to the discovery order, plaintiffs developed extensive factual material that focuses primarily on coordinated industry activities in opposing government efforts to impose more stringent controls on firearm sales and distribution. A brief summary is provided below.

### 1. Membership in Trade Associations

Many of the defendants are members of one or more of three professional trade associations that represent the interests of firearm manufacturers: the Sporting Arms and Ammunition Manufacturers' Institute, Inc. ("SAAMI"), the National Shooting Sports Foundation, Inc. ("NSSF"), and the American Shooting Sports Council, Inc. ("ASSC"). SAAMI and NSSF represent primarily manufacturers while ASSC also represents the interests of distributors and dealers. All but two SAAMI members belong to NSSF, founded as an offshoot of SAAMI, and all but one SAAMI member belong to ASSC.

All three organizations lobby in varying degrees, with the ASSC being perhaps the most aggressive of the three. Plaintiffs also present testimony showing an agreement between the ASSC and the National Rifle Association ("NRA"), a gun users' lobby, to use gun dealers to recruit new NRA members. Under the agreement, the ASSC and the local dealer each receive a payment from the NRA for each new member enrolled through the recruitment program.

### 2. Lobbying Activity

Plaintiffs' evidence showed that some lobbying activity is coordinated between the three trade associations and the NRA, and

that the purpose of most of their lobbying activity is to defeat legislation that would impose more stringent regulations on gun possession, use, and distribution. Plaintiffs assert that SAAMI took positions and lobbied against many proposed firearm regulations and successfully lobbied to keep guns and ammunition outside the regulatory purview of the Consumer Products Safety Commission.

Plaintiffs cite several instances where independent trade associations or manufacturers adopted positions that were less antagonistic to gun regulations than those maintained by the industry as a whole. In each case the industry is shown in information elicited by plaintiffs to have acted quickly and decisively in bringing the individual manufacturer or group into line. These examples arguably demonstrated that manufacturers' positions on many issues of handgun policy are established and maintained industry-wide.

Plaintiffs cite the role of the NRA in coordinating lobbying activity and the manufacturers' reliance on the NRA's efforts against gun distribution regulations. They also cite efforts by SAAMI, NSSF, and the NRA to coordinate campaign contributions in support of candidates opposed to gun regulations.

### 3. Marketing and Distribution

Plaintiffs allege that the defendants, as an industry, have failed to supervise its wholesale distributors and retail dealers. A report by the United States Department of Justice estimated that in 1991 there were more than 235,000 federally licensed firearms dealers, only 30,000 of whom operated out of any kind of retail gun store or sporting goods store or department. These dealers do not appear to be closely monitored; reportedly many of these dealers introduce guns into the underground gun market.

Consonant with the magistrate judge's discovery order little of the material portrays actual marketing activity. Nevertheless some facts developed by plaintiffs suggest that there might be a prevalent understanding within the industry as to what marketing precautions need to be taken to reduce dangers of handgun sales to people in the United States.

For example, the members of SAAMI adopted a pledge "to sell our products to only legitimate retail firearms dealers." Statements by officials of several defendants suggest that defendants understood the pledge to be only a commitment not to sell handguns to anyone not licensed as a dealer by the Bureau of Alcohol Firearms and Tobacco. Representatives of several defendants stated that they do not view the pledge as requiring anything more than selling to any distributor or dealer so long as that distributor or dealer holds a federal firearms license. The pledge is not perceived to be binding on manufacturers to make sure that the distributors to whom they sell handguns also comply with the pledge.

### III. Constitutional and Statutory Limits on Plaintiffs' Claims

#### A. First Amendment

■ The First Amendment guarantees "the right of the people ... to petition the Government for a redress of grievances." U.S. Const. Amend. I. Under what is known as the *Noerr–Pennington* doctrine, many actions under various antitrust or tort theories against businesses or individuals are prohibited where the challenged activity involves lobbying, despite the defendant's anticompetitive or otherwise injurious purpose or effect. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The doctrine developed in large part to protect the First Amendment right to petition government. *See Noerr,* 365 U.S. at 132–33, 81 S.Ct. at 530; *see also* Daniel R. Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr–Pennington Doctrine,* 45 U.Chi. L.Rev. 80, 94–104 (1977) (noting that the First Amendment, not construction of the antitrust statute, is the real basis of the doctrine). Shielded activity includes petitioning legislatures, administrative bodies, and the courts. *See California Motor Transport v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

While the doctrine originated as a limit on antitrust liability, *Noerr–Pennington* has been extended by analogy to protect petitioning activity challenged under other federal statutes. *See Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (labor law claims); *Eaton v. Newport Bd. Of Educ.,* 975 F.2d 292 (6th Cir.1992) (42 U.S.C. § 1983); *Video Int'l Products v. Warner–Amex Cable Communications,* 858 F.2d 1075 (5th Cir.1988) (same). *Noerr–Pennington* has also been applied to various state law claims. *See Suburban Restoration Co. v. Acmat Corp.,* 700 F.2d 98 (2d Cir.1983) (*Noerr–Pennington* barred Connecticut antitrust and tortious interference claims based on the filing of a lawsuit); *Pound Hill Corp. v. Perl,* 668 A.2d 1260, 1263 (R.I.1996) (*Noerr–Pennington* adds a constitutional gloss to civil actions for torts of abuse of process and interference with advantageous relations); *Video Int'l Products v. Warner–Amex Cable Communications,* 858 F.2d 1075 (5th Cir.1988) (conduct protected from antitrust litigation under *Noerr–Pennington* also shielded from business tort claims); *see also Whelan v. Abell,* 48 F.3d 1247, 1253–55 (D.C.Cir.1995). The *Whelan* court noted that "it is hard to see why, as an abstract matter, the common law torts of malicious prosecution and abuse of process might not in some of their applications be found to violate the First Amendment." 48 F.3d at 1254.

The extent of *Noerr–Pennington*'s application to state common law torts such as negligence and product liability is largely unresolved. *See Whelan,* 48 F.3d at 1253–55. Courts have held *Noerr–Pennington* to apply to product liability claims brought under a concert of action or civil conspiracy theory and under negligence. *See Senart v. Mobay Chemical Corp.,* 597 F.Supp. 502, 505–06 (D.Minn.1984); *Anchorage Joint Venture v. Anchorage Condominium Ass'n,* 670 P.2d 1249 (Colo.App.1983). In *Senart,* the court rejected a concerted action claim against defendants who collectively lobbied the Occupational Safety and Health Administration to oppose more stringent standards of exposure to toxic chemicals. The court reasoned that "defendants' concerted action sought only permissible ends and acted only through permissible means" and that the activity was "clearly permissible" under the First Amendment right to petition. *Senart,* 597 F.Supp. at 506.

 Two exceptions limit the extent of the *Noerr–Pennington* shield. First, efforts to influence government are not protected where they are found to be a "sham" to disguise what is otherwise nothing more than an attempt to directly injure a competitor and the political actor has no real interest in the outcome. *See Noerr,* 365 U.S. at 144, 81 S.Ct. at 533; *Cipollone v. Liggett Group Inc.,* 668 F.Supp. 408, 409 (D.N.J.1987); Fischel, *supra,* at 104. The Supreme Court has recognized that, by definition, a "successful 'effort to influence government action'" cannot be considered a sham. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 58, 113 S.Ct. 1920, 1927, 123 L.Ed.2d. 611 (1993) (citations omitted). Second, courts have declined to invoke the protection of *Noerr–Pennington* where the political activity involved illegal, corrupt or unethical means. *See Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n,* 663 F.2d 253, 262–63 (D.C.Cir.1981); *Cipollone,* 668 F.Supp. at 410.

## B. Second Amendment

It is important to bear in mind that plaintiffs seek to enforce state, not federal, tort law. Thus it is not necessary to plumb the deeper meaning of the Second Amendment as it applies to Congress. The Amendment limits congressional power over the colonial analogues of our National Guard. It does not guarantee the right to kill. Nor does it inhibit state tort law. It does not protect the manufacturers of guns against the plaintiffs' charge that they must take whatever reasonable precautions are required by state tort law to prevent or limit the operation of an illegal handgun market that supplies criminals.

The Supreme Court has consistently rejected the proposition that the entire Bill of Rights has been incorporated through the 14th Amendment Due Process clause to apply to the states. *See Adamson v. California,* 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903

(1947), *overruled on other grounds, Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Palko v. Connecticut,* 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937), *overruled on other grounds, Benton v. Maryland,* 395 U.S. 784, 793–94, 89 S.Ct. 2056, 2062, 23 L.Ed.2d 707 (1969); *see also* Laurence H. Tribe, *American Constitutional Law* 772–74 (1988) (discussing jurisprudential basis of selective incorporation).

■ Specifically, the Supreme Court has held that the Second Amendment limits only the power of Congress. *Presser v. Illinois,* 116 U.S. 252, 265, 6 S.Ct. 580, 584, 29 L.Ed. 615 (1886). While many clauses contained within the first eight amendments have been incorporated to apply to the states, the Supreme Court has resisted opportunities to incorporate the Second Amendment. *See Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Quilici v. Village of Morton Grove,* 695 F.2d 261, 270 (7th Cir. 1982). The states and their political subdivisions continue to have a substantial role under our federal system in regulating the sale and use of guns. *See United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); *Quilici,* 695 F.2d at 267–70; *Richmond Boro Gun Club, Inc. v. City of New York,* 896 F.Supp. 276, 283–84 (E.D.N.Y.1995).

In *Malloy* the Supreme Court noted its willingness·to incorporate through the Fourteenth Amendment certain rights guaranteed in the Bill of Rights, even where the Court had earlier rejected incorporation of the same right. *See Malloy,* 378 U.S. at 5, 84 S.Ct. at 1492. The *Malloy* Court cited *Presser,* however, as a specific example of a decision denying incorporation of the Second Amendment through the Fourteenth. 378 U.S. at 4 n. 2, 84 S.Ct. at 1491 n. 2. Thus, the Supreme Court's continued citation of *Presser,* and the absence of more recent contrary Supreme Court authority, indicates that *Presser* continues to serve as authority denying the Second Amendment's application to the states. *See Quilici,* 695 F.2d at 270.

In addition, the Court's jurisprudence teaches that the Amendment establishes a collective right, rather than an individual or private right. *See, e.g., United States v.*

*Warin,* 530 F.2d 103 (6th Cir.), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976); *see also* Tribe, *supra,* at 299 n. 6 (Court likely to adhere to "states' rights view of Amendment"); Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 14.2 at 347–48 n. 4 (1992) (same); Garry Wills, *To Keep and Bear Arms,* N.Y.Rev. Books, Sept. 21, 1995 at 62 (criticizing historical and theoretical basis of the individual rights view of the Second Amendment). In *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), the Court upheld the constitutionality of the National Firearms Act which required registration of firearms and regulated firearm transfers. *Id.* The Court maintained that the Second Amendment must be interpreted and applied "with the obvious purpose to assure the continuation and render possible the effectiveness of [national] forces." *Id.,* 307 U.S. at 178, 59 S.Ct. at 818; *see also Lewis v. United States,* 445 U.S. 55, 65 n. 8, 100 S.Ct. 915, 921 n. 8, 63 L.Ed.2d 198 (1980); *Warin,* 530 F.2d at 106; *see generally* Wills, *supra.* As one court of appeals noted, the Second Amendment right "applies only to the right of the State to maintain a militia and not to the individual's right to bear arms, there can be no serious claim to any express constitutional right of an individual to possess a firearm." *Stevens v. United States,* 440 F.2d 144, 149 (6th·Cir.1971) (quoted in *Warin,* 530 F.2d at 106).

■ If, as is the case, states can ban private possession and use of firearms absent federal preemption, *see* Part III.C.1, *infra,* a fortiori, there can be no question of the right to control firearm sales. That power can be exercised directly by administrative or other regulation or indirectly through tort law.

C. Statutory and Regulatory Scheme

Federal statutes and regulations establish an extensive system regulating the sale of firearms. *See* 18 U.S.C. §§ 921–930; 27 C.F.R. § 178 (1995). Many of these provisions were adopted as part of the Gun Control Act of 1968. *See* Pub.L. No. 90–351, § 902, 82 Stat. 226. Others were added more recently as part of the Brady Handgun Violence Protection Act and the Federal

Firearm License Reform Act of 1993, Pub.L. No. 103–159, 107 Stat. 1539, and the Public Safety and Recreational Firearms use Protection Act, Pub.L. No. 103–322, 108 Stat. 1997, 1999, 2014, 2020, 2150.

The statutes provide a system for licensing firearm dealers, prohibiting any others from dealing in firearms. *See* 18 U.S.C. §§ 922(a), 923; *see also Frank v. United States,* 78 F.3d 815 (2d Cir.1996) (rejecting 10th Amendment challenge to provision requiring state officers perform background checks). Licensed dealers may not sell firearms to minors or to those whose possession of a firearm would violate federal, state, or local law. *See, e.g.,* 18 U.S.C. § 922(b)(1) (sale to minors); 18 U.S.C. § 922(b)(2) (sale unlawful if buyer's possession would violate state or local law); 18 U.S.C. § 922(g) (sale unlawful to persons convicted of certain felonies, fugitives, unlawful narcotics users, persons adjudged mentally defective, and others). Also required are background checks designed to reduce the possibility that gun sales by a licensed dealer will result in violations of federal, state, or local law. *See* 18 U.S.C. § 922(s) (seven day waiting period and background check by law enforcement); 18 U.S.C. § 922(t) (national instant criminal background check).

Authorized are the promulgation of regulations. *See* 18 U.S.C. § 926. Some of those regulations further define the rules and proceedings for obtaining federal licenses. *See* 27 C.F.R. §§ 178.41–178.78. They also establish recordkeeping requirements for licensees. *See* 27 C.F.R. §§ 178.121–178.131.

### 1. Preemption of State Tort Law

■ Under the Constitution's Supremacy Clause, federal statutes and regulations preempt conflicting state law. U.S. Const. Art. VI, cl. 2; *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 506, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). Preemption may be based upon an express statutory provision, *see, e.g., Cipollone,* 505 U.S. at 517–23, 112 S.Ct. at 2618–21, or implied in the statute's structure and purpose, *Freightliner Corp. v. Myrick,* —— U.S. ——, ——, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385 (1995); *Cipollone,* 505 U.S. at 516, 112 S.Ct. at 2617. Implied preemption may result either when the scope of the statute signals congressional design that

the statutory or regulatory scheme exclusively occupy the entire field or when the state law "actually conflicts" with federal law. *See Freightliner Corp.,* —— U.S. at ——, 115 S.Ct. at 1487–88 (actual conflict); *Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (field preemption).

■ State tort law—whether judicial or legislative in origin—is one method by which the states exercise their police powers to protect their citizens' welfare. It may be preempted by federal law. *See Cipollone,* 505 U.S. at 522–23, 112 S.Ct. at 2620–21; *Burke v. Dow Chemical Co.,* 797 F.Supp. 1128, 1136 (E.D.N.Y.1992).

■ In determining whether a conflict warranting preemption exists in a given case, a court's analysis must begin " 'with the assumption that the historic police powers of the states [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.' " *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947) (quoted in *Cipollone,* 505 U.S. at 516, 112 S.Ct. at 2617). "[T]he well-established presumption is against preemption of local law unless a court is 'absolutely certain' that such was Congress's intent." *Richmond Boro Gun Club, Inc. v. City of New York,* 896 F.Supp. 276 (E.D.N.Y.1995) (citing *inter alia Gregory v. Ashcroft,* 501 U.S. 452, 464, 111 S.Ct. 2395, 2402–03, 115 L.Ed.2d 410 (1991)); *see also Burke,* 797 F.Supp. at 1136 (court should not infer preemption lightly in areas "of core concern to the states such as tort law") (citations omitted); *cf. United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (limiting congressional power to regulate gun sales and distribution near schools). Congressional "intent" as devised from the statutory language and structure is the " 'ultimate touchstone' " of preemption analysis. *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978) (citations omitted).

Two courts have recently considered the preemptive effect of the federal Civilian Marksmanship Program ("CMP") over state and local gun regulations. 10 U.S.C.

§§ 4307–4313; *See Fresno Rifle and Pistol Club, Inc. v. Van De Kamp*, 965 F.2d 723 (9th Cir.1992); *Richmond Boro Gun Club, Inc. v. City of New York*, 896 F.Supp. 276 (E.D.N.Y.1995). Congress created the CMP with the design of "creat[ing] interest in marksmanship training among men of military age." *Fresno Rifle and Pistol Club*, 965 F.2d at 725 (quoting General Accounting Office report). Through the CMP Congress authorized, *inter alia*, the sale of certain types of rifles to organized civilian clubs under the auspices of the armed forces. *Id.* Both courts rejected claims that the challenged state and municipal gun control regulations impeded the sale or use of guns promoted through the CMP and sold under that program. *See Fresno Rifle and Pistol Club*, 965 F.2d at 726–27; *Richmond Boro Gun Club*, 896 F.Supp. at 285.

In *Coalition of New Jersey Sportsmen v. Florio*, 744 F.Supp. 602 (D.N.J.1990), the court held that the provision in New Jersey's assault weapon ban defining assault weapons to include certain B–B and pellet-firing air guns was preempted as a direct conflict by a federal statute that expressly barred states from prohibiting sale (other than to minors) of such guns. *Id.* at 605–08; *See* 15 U.S.C. § 5001(g). That same court, however, found that New Jersey's law criminalizing possession of certain assault weapons was not preempted by a federal statute permitting interstate transport of unloaded guns from one state where such guns are legal to another through a state in which such guns are illegal. 744 F.Supp. at 608–10. The court upheld the state law even though the federal law expressly permitted possession of guns, under proscribed circumstances under which the state law banned possession altogether.

The statutory scheme that is most likely to give rise to preemption questions concerning state law that would limit the manner in which handguns are marketed is that governing the licensing, sale, and distribution of firearms. *See* 18 U.S.C. §§ 921–930 (1995). This chapter of the federal criminal law contains a savings clause excluding a general preemptive effect. It provides that

[n]o provision of this chapter shall be construed as indicating an intent on the part of Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two laws cannot be reconciled or consistently stand together.

18 U.S.C. § 927. Nowhere does the chapter contain a clause expressly preempting state law.

Regulations promulgated pursuant to 18 U.S.C. §§ 921–930 (1995) are generally governed by the statutory savings clause. *See* 27 C.F.R. § 178 (1995). The regulations state that its provisions "are in addition to, and not in lieu of, any other provision of law, or regulation, respecting commerce in firearms or ammunition." 27 C.F.R. § 178.2. Relating to licensing is a provision that further limits the potential for finding preemption:

A license issued under this part confers no right or privilege to conduct business or activity contrary to State or other law. The holder of such a license is not by reason of the rights and privileges granted by that license immune from punishment for operating a firearm or ammunition business or activity in violation of the provisions of any State or other law.

27 C.F.R. § 178.58. Thus, absent a direct conflict between the federal statute or the federal regulations and state tort law, no preemption of state tort claims may be found to exist.

### 2. Effect of Statutory Scheme on Duties Under State Tort Law

Compliance with federal statutes or regulations does not prevent a court from finding that a defendant acted negligently where a reasonable person would have taken additional precautions. *See Feiner v. Calvin Klein, Ltd.*, 157 A.D.2d 501, 549 N.Y.S.2d 692, 693 (1st Dep't 1990); *Sherman v. M. Lowenstein & Sons, Inc.*, 28 A.D.2d 922, 282 N.Y.S.2d 142, 143 (2d Dep't 1967); Restatement (Second) of Torts § 288C (1965). Terms of a statute or a regulation are not automatically adopted by New York courts as a standard of due care in negligence litiga-

tion. *See, e.g., Dance v. Town of Southampton*, 95 A.D.2d 442, 446, 467 N.Y.S.2d 203, 206 (2d Dep't 1983). Adoption of a statutory requirement as a standard of care is generally a matter of judicial construction and should be based on the appropriateness of the statute for that purpose. *Id.* While compliance with a federal or state statute may constitute evidence that a defendant exercised due care, it does not preclude a finding of negligence. *Feiner*, 549 N.Y.S.2d at 693.

### D. Application

#### 1. First Amendment

Congress and regulatory agencies frequently consider proposals concerning the manufacture, distribution, sale, use, ownership, and possession of various forms of firearms and ammunition. Federal firearm policy cuts a high profile in national debate, garnering significant media attention. Advocacy groups on all sides pursue their interests with vigor in the political and regulatory arena.

■ Plaintiffs do not assert and have not elicited testimony to show that any of the lobbying activities undertaken by the defendants or the trade associations they support constitute a sham or involve illegal political activity. Defendants' efforts to affect federal firearm policies through lobbying activities are prime examples of the types of activity the First Amendment, through its rights of free speech and petition, sought to protect.

A core principle of the *Noerr–Pennington* doctrine is that lobbying alone cannot form the basis of liability, although such activity may have some evidentiary value. It is not enough to show that the defendants act in some coordinated fashion as an industry. *See, e.g., Centrone v. Schmidt*, 114 Misc.2d 840, 452 N.Y.S.2d 299, 302 (Sup.Ct. Nassau Co.1982) (concert of action theory not applicable where concerted action not tortious or inherently dangerous). Lobbying before either federal or state authorities was not tortious.

#### 2. Second Amendment

Plaintiffs rely upon state common law to further control the marketing of handguns to private individuals. Nothing in the Second Amendment prohibits this reliance. The Second Amendment does not control state tort law. It does not limit regulation of private handgun sale or use through state tort law.

#### 3. Preemption

Congressional design is clear. Federal laws controlling the sale and distribution of firearms do not preempt state tort law. The statutes contain no express preemption clause. On the contrary, the key law contains an explicit savings clause.

■ The only way a federal law regulating the handgun market can preempt state common law is through a direct conflict making mutual compliance impossible. Defendants have not shown how any remedy sought by plaintiffs would force noncompliance with federal handgun laws governing sales, licensing, and distribution. Plaintiffs seek only to demonstrate the state law required gun manufacturers to take greater precautions than are required under federal law.

#### 4. Effect of Federal Statute on State Tort Duties

The existence of an extensive federal regulatory scheme does not, by itself, establish defendants' duty of care under New York tort law. A court may elect to affirmatively construe the federal statute as setting the appropriate state tort standard of care. *See Dance v. Town of Southampton*, 95 A.D.2d 442, 446, 467 N.Y.S.2d 203, 206 (1983). Whether the New York Court of Appeals would adopt the federal statutory and regulatory scheme as the appropriate standard of care is not presented as an issue on the present motions. That issue may be briefed upon completion of discovery on the underlying negligence claim. At this stage it is sufficient to determine that the federal statute and regulations do not automatically control state tort standard of care.

### IV. Law of Product Liability

Plaintiffs' complaint alleges design defect claims against defendants on the ground that the handguns they manufactured did not

have anti-theft or other related safety devices that would have prevented their use by individuals other than the guns' owners. Plaintiffs also allege that handguns are unreasonably dangerous products and that, by marketing them so that they can readily fall into the hands of children, the manufacturers are engaged in ultrahazardous activities.

### A. Generally

New York product liability law trifurcates claims, setting distinct requirements for claims involving manufacturing defects, design defects, and failure to adequately warn. *See, e.g., DeRosa v. Remington Arms Co., Inc.,* 509 F.Supp. 762 (E.D.N.Y.1981); *see also* Restatement (Third) of Torts: Products Liability § 2 (Tentative Draft No. 1, 1995).

■ A manufacturing defect results when a mistake in manufacturing renders a product that is ordinarily safe dangerous so that it causes harm. *Victorson v. Bock Laundry Mach. Co.,* 37 N.Y.2d 395, 373 N.Y.S.2d 39, 335 N.E.2d 275 (1975).

■ A warning defect occurs when the absence or inadequacy of a warning for a reasonably foreseeable risk accompanying a product causes harm. *Torrogrossa v. Towmotor Co.,* 44 N.Y.2d 709, 405 N.Y.S.2d 448, 376 N.E.2d 920 (1978).

■ A design defect occurs when the product as designed is unreasonably dangerous for its intended use. *Micallef v. Miehle Co.,* 39 N.Y.2d 376, 384 N.Y.S.2d 115, 348 N.E.2d 571 (1976). The unreasonableness of the risk is measured in light of other design considerations. *See DeRosa v. Remington Arms Co., Inc.,* 509 F.Supp. 762 (E.D.N.Y. 1981); *Robinson v. Reed–Prentice Division,* 49 N.Y.2d 471, 426 N.Y.S.2d 717, 403 N.E.2d 440 (1980). The manufacturer is liable if a reasonable alternative design, at reasonable cost, would have reduced the foreseeable risks posed by the product, and the omission of the alternative design rendered the product unreasonably safe. Restatement (Third) of Torts: Products Liability § 2 cmt c (Tentative Draft No. 1, 1995).

### B. Treatment of Guns Under Product Liability

A handgun's "very purpose is to cause injury—to kill and to wound." *DeRosa v. Remington Arms Co., Inc.,* 509 F.Supp. 762, 767 (E.D.N.Y.1981); *see also Forni v. Ferguson,* No. 132994/94, slip op. at 9 (Sup.Ct. N.Y.Co. Aug. 2, 1995) (unpublished) ("The risk of a gun lies in its function and not a defect in the product."); Note, *Handguns and Product Liability,* 97 Harv.L.Rev. 1912, 1918 (1984) ("[H]andguns necessarily fire bullets with deadly force."). Hazard is an inherent risk of the product. *DeRosa,* 509 F.Supp. at 767. As the New York Court of Appeals noted:

[S]ome products, for example knives, must by their very nature be dangerous to be functional. [A] defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use: that is, one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce.

*Robinson v. Reed–Prentice Division,* 49 N.Y.2d 471, 479, 426 N.Y.S.2d 717, 720, 403 N.E.2d 440, 443.

In *DeRosa* the alleged design defect was that a shotgun's "trigger pull force" should have been fifteen pounds instead of four-and-a-half pounds in order to prevent accidental discharges. 509 F.Supp. at 765. The plaintiff argued that the extra pressure would prevent police officers from accidentally firing under stress. *Id.* The claim of the alleged defect's causal relationship to the injury in that case was purely speculative. The cost of modifying the design—measured not merely in money, but in lost efficiency, accuracy, and uniformity—outweighed the benefits of the modification as a matter of New York law. *Id.* at 769–70.

Both federal and state courts in New York have recently dismissed product liability claims against gun and ammunition manufacturers in claims brought by victims of the attack by Colin Ferguson on a Long Island Railroad commuter train. *See McCarthy v. Sturm, Ruger & Co.,* 916 F.Supp. 366

(S.D.N.Y.1996); *Forni, supra,* No. 132994/94. The grounds for dismissal were very much the same as in *DeRosa.* The *McCarthy* court rejected a claim that the design of the bullets aggravated plaintiffs' injuries. *McCarthy,* 916 F.Supp. at 370–71. It reasoned that under plaintiffs' theory "every person injured by a bullet would be able to claim that if the bullet had been smaller, there would have been less damage and accordingly, the manufacturer should be strictly liable based on that design defect." *Id.* at 371.

For a viable New York tort law design defect claim against a handgun manufacturer, a plaintiff must allege that a particular model in question is unreasonably dangerous. *See DeRosa,* 509 F.Supp. at 769 ("[T]here must be something wrong with the product and if nothing is wrong there will be no liability"); Restatement (Third) of Torts: Products Liability § 2 cmt c (Tentative Draft No. 1, 1995) (test is availability of reasonable alternative design, not social desirability of product).

The *Forni* and *McCarthy* courts also dismissed plaintiffs' negligent marketing claims against the manufacturer. Plaintiffs alleged in both cases that the defendant was negligent in manufacturing and marketing (i.e. selling) the gun when the likelihood of injury was foreseeable. *McCarthy,* 916 F.Supp. at 369; *Forni,* slip op. at 11. That claim, however, under the facts of those cases really amounted to an alternate pleading of the product liability theory. *See McCarthy,* 916 F.Supp. at 369–70 (describing theory that manufacturers' duty is established by foreseeable use of the ammunition); *Forni,* No. 132994/94, slip op. at 11 (describing theory as alleging moral duty to reduce killings by not designing and selling semi-automatic handguns). Such a claim would create limitless liability for any deaths caused by the use of the gun model used in the killings. *See Forni,* No. 132994/94, slip op. at 11. The mere act of manufacturing and selling a handgun does not give rise to liability absent a defect in the manufacture or design of the product itself.

## C. Ultrahazardous Activity

The general rule in torts is that one who "carries on an abnormally dangerous activity" is strictly liable for the harm inflicted by the activity. *See Spano v. Perini,* 25 N.Y.2d 11, 15, 302 N.Y.S.2d 527, 529, 250 N.E.2d 31 (1969); Restatement (Second) of Torts § 519(1) (1965). Factors that courts consider in determining whether an activity is abnormally dangerous include: (1) a high degree of risk of harm to others, (2) the likelihood that the harm will be great, (3) the inability to eliminate the risk through the exercise of reasonable care, (4) the extent to which the activity is uncommon, (5) the inappropriateness of the activity to the place where it is carried out, and (6) the extent of the activity's value to the community. *Id.* at § 520; *see also* William K. Jones, *Strict Liability for Hazardous Enterprises,* 92 Colum.L.Rev. 1705, 1707 (1992).

Strict liability for abnormally dangerous activity generally pertains to activity carried on at a specific location. *See Doundoulakis v. Town of Hempstead,* 42 N.Y.2d 440, 398 N.Y.S.2d 401, 368 N.E.2d 24 (1977); Restatement (Second) of Torts § 520 cmt j. While not restricted to injuries that occur on the defendant's property, the rule is considered as imposing strict liability for "non-natural" uses of land. *Id.* Examples of strict liability under this theory include use of atomic energy, the manufacture, storage or use of high explosives, the operation of oil or gas wells, the use of large storage tanks for gas or other flammable materials, or the operation of high voltage power lines. *See* Jones, *supra,* at 1710 (citing Restatement (Second) of Torts § 520 cmts. g, h, i, j). As noted in the restatement, "the fact that the activity is inappropriate *to the place where it is carried out* is a factor of importance in determining whether the danger is an important one." Restatement (Second) of Torts § 520 cmt j (emphasis added).

Consistent with this approach, the New York Supreme Court recently ruled that a manufacturer could not be held strictly liable under an ultrahazardous activity theory for manufacturing and distributing guns. *See Forni v. Ferguson,* No. 132994/94, slip op. at 9–10 (Sup.Ct.N.Y.Co. Aug. 2, 1995); *but see*

*In re 101 California Street,* No. 959316 (Cal.Super.Ct.2d Dep't Apr. 10, 1995) (manufacturing and marketing assault weapon to general public constitutes ultrahazardous activity).

 Abnormally dangerous activities are distinguished from dangerous instrumentalities. A dangerous instrumentality is an object or substance, such as a refrigerant, poison, pesticide, or, as in the present case, a firearm. *See, e.g., Loop v. Litchfield,* 42 N.Y. 351 (1870) (poisons); *Mikula v. Duliba,* 94 A.D.2d 503, 464 N.Y.S.2d 910 (4th Dep't 1983) (firearms). Strict liability does not attach to any injuries resulting from the use of a dangerous instrumentality. A person is not liable for such injuries if he or she uses "that degree of care which a reasonable man would exercise under the circumstances, commensurate with the apparent risk involved." *Mikula,* 94 A.D.2d at 506, 464 N.Y.S.2d at 912. As the *Mikula* court noted, the standard of care is not a more exacting one than ordinary negligence, but merely reflects the ordinary prudence required under negligence law applied to the high degree of risk involved. *See id.*

### D. Application of Law to Facts

Plaintiffs' first product liability claim alleges that handguns are unreasonably dangerous because of the lack of an anti-theft or related safety device. There is no valid basis for this claim. As the *Robinson* court noted:

> A manufacturer need not incorporate safety features into its product so as to guarantee that no harm will ever come to any user [or bystander] no matter how careless or reckless [the user may be].

*Robinson v. Reed–Prentice Division,* 49 N.Y.2d at 481, 426 N.Y.S.2d at 721, 403 N.E.2d at 444.

 Whether or not New York products liability law would require an anti-theft safety mechanism as part of the design of handguns requires a balancing of the risk and utility of incorporating such a device into the design of handguns sold by defendants. Plaintiffs have not shown that such a device is available, nor have they asserted the possibility of showing at trial that such a device

would satisfy the New York risk-utility test. The hypothetical safety device relied upon by plaintiffs falls far short of even the proposed trigger pull force that was rejected as a reasonable alternative in *De Rosa. See De-Rosa v. Remington Arms Co., Inc.,* 509 F.Supp. 762, 767 (E.D.N.Y.1981). Summary judgment must be granted to defendants on the design defect claim.

 Plaintiffs also have no basis for holding defendants strictly liable under an ultrahazardous or abnormally dangerous activity theory. As discussed in Part IV.C, *supra,* this cause of action relates primarily to the improper use of land. Marketing, while conduct, is not "activity" within the meaning of this doctrine. Summary judgment must be granted in favor of defendants on the abnormally dangerous activities claim.

## V. Fraud

Plaintiffs' seventh cause of action advances fraud as a basis of relief. They argue that defendants' alleged deceitful misrepresentations to prospective handgun purchasers and to government officials resulted in increased sales of handguns and less stringent regulation of the handgun market.

### A. Law of Fraud

 Under New York law, fraud liability lies only if the claimant falls within the purview of those whom the defendant intended would act upon the representation. *See, e.g., Kuelling v. Roderick Lean Mfg. Co.,* 183 N.Y. 78, 85, 75 N.E. 1098 (1905); *see also Steinberg v. Guild,* 23 A.D.2d 750, 258 N.Y.S.2d 670 (1st Dep't 1965). The elements of fraud have been succinctly identified by the Court of Appeals as consisting of representation, falsity, scienter, deception, and injury. *See Kuelling,* 183 N.Y. at 85, 75 N.E. 1098. It is not necessary to review all of the elements here. For plaintiffs to succeed, they must show that any deception would have been "calculated and intended" to influence the plaintiffs. *Id.; see also Brackett v. Griswold,* 112 N.Y. 454, 20 N.E. 376 (1889). As the *Brackett* court noted, a person making a representation is only accountable for its truth or honesty to those he or she seeks to influence. *Id.* Absence of this element is

fatal to any claim for fraud. *See Kuelling,* 183 N.Y. at 85, 75 N.E. 1098.

### B. Application

■ Plaintiffs can not succeed on a fraud claim. They do not claim that they or those whom they represent were deceived by the defendants. Rather, they allege that the defendants deceived government officials and handgun purchasers. Even assuming these allegations to be true, the plaintiffs may not recover for fraud. Summary judgment on the fraud theory must be granted.

### VI. Collective Liability

The critical question on this motion is whether defendants may be held collectively liable under New York law on the remaining negligence claims. Whether defendants are entitled to summary judgment on the negligence issue itself is not at issue at this time since it was not fully briefed. The question of joint liability needs to be addressed because plaintiffs are apparently joining additional plaintiffs who do not know who manufactured the gun used to kill their deceased relatives.

### A. Applicable Law

■ Federal courts sitting in diversity apply the substantive law of the forum state on outcome-determinative issues. *Erie R.R. v. Tompkins,* 304 U.S. 64, 80, 58 S.Ct. 817, 823, 82 L.Ed. 1188 (1938); 28 U.S.C. § 1652 (1988). Included is the forum state's approach to choice-of-law problems. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). In determining the applicable state law, greatest weight is given to decisions of the forum state's highest court, in this case the New York Court of Appeals, the state's constitution and its statutes. *Erie,* 304 U.S. at 78, 58 S.Ct. at 822; *Travelers Ins. Co. v. 633 Third Assocs.,* 14 F.3d 114, 119 (2d Cir. 1994).

■ Where an issue has not been decided definitively, the district court must predict how the highest state court would resolve the legal issue. *DeWeerth v. Baldinger,* 38 F.3d 1266, 1273 (2d Cir.1994); *Travel-*

*ers Ins. Co.,* 14 F.3d at 119; *In re E. & S. Dist. Asbestos Litig.,* 772 F.Supp. 1380, 1388–91 (E. & S.D.N.Y.1991), *rev'd in part on other grounds sub nom., In re Brooklyn Navy Yard Asbestos Litig. (Joint E. & S. Dist. Asbestos Litig.),* 971 F.2d 831 (2d Cir. 1992). Federal district courts are not bound by lower state court precedents that they find probably would be rejected on appeal. *Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *In re E. & S. Dist. Asbestos Litig.,* 772 F.Supp. at 1390.

### B. Choice-of-Law

#### 1. New York's Choice of Law Principles

■ New York choice-of-law principles require application of the law of the state having the most significant contacts with the matter in dispute. *Babcock v. Jackson,* 12 N.Y.2d 473, 479, 240 N.Y.S.2d 743, 747, 191 N.E.2d 279, 282 (1963); *Auten v. Auten,* 308 N.Y. 155, 160, 124 N.E.2d 99, 102 (1954); *see also* Restatement (Second) Conflict of Laws § 188 (1971); Harold G. Korn, *The Choice-of-Law Revolution: A Critique,* 83 Colum.L.Rev. 772, 820–40 (1983) (reviewing New York's development of modern choice-of-law rules). The law of " 'which[ever] state ... has the most significant relationship with the occurrence and with the parties determines their rights and liabilities in tort....' " *Babcock,* 12 N.Y.2d at 482, 240 N.Y.S.2d at 749, 191 N.E.2d at 283–84 (quoting Restatement, Second, Conflict of Laws, § 379[1] ).

#### 2. Application

Both plaintiffs serving as the administrators of the decedents' estates are residents of New York State. Beretta and Taurus, the most likely manufacturers of the gun used to kill Mr. Ray, are located in Italy and Maryland (Beretta) and Florida (Taurus). Smith & Wesson, the manufacturer of the gun used to kill Mr. Johnstone, has its principal place of business in Massachusetts. The other defendants are located in numerous states throughout the United States, and several are located overseas.

Mr. Ray was shot within the state of New York while Mr. Johnstone was shot in California, but those states might not be found to

be the site of defendants' tortious conduct. The nature of the tort alleged and the assertion of a theory of collective liability make the defendants' total contacts too diffuse to serve as a basis for anchoring the choice-of-law determination. If defendants' negligent conduct is not specific sales of specific guns, but their having collectively fostered the growth of an underground handgun market, the site of the tortious conduct may be too nebulous to pin down to a particular state.

The parties have not briefed the choice-of-law issue and have not moved to have a particular state's law apply. On the question of collective liability, however, the center of gravity is in New York where the plaintiffs are located, and not within the nebulae of defendants' locations or alleged conduct. As Professor Korn has noted, New York courts tend to give New York plaintiffs the protection of New York law. *See* Korn, *supra,* at 780 (noting courts' well-known preference for applying forum state's law). Defendants have not charged that plaintiffs acquired residence here to establish venue in this state or to provide for application of New York tort law.

If the locations of the actual shootings were found to have substantial weight, New York law would apply in Ms. Hamilton's case, while a strong case could be made for applying either New York or California law in Ms. Johnstone's case. It is worth noting that on questions of collective liability in tort, the highest court of both New York and California have been national innovators and have adopted substantially similar approaches. *See Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069, *cert. denied,* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989); *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 602, 163 Cal.Rptr. 132, 139, 607 P.2d 924, 931, *cert. denied,* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980). The outcome reached might well be the same.

### C. Law of Summary Judgment

■ The moving party bears the burden on a motion for summary judgment of demonstrating that there is "no genuine issue as to any material fact" and that the movant is therefore entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also* 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2727, at 121 (2d ed. 1983). In deciding whether to grant a motion for summary judgment, "all ambiguities and inferences to be drawn from the underlying facts should be drawn in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Henderson v. Center for Community Alternatives,* 911 F.Supp. 689, 694 (S.D.N.Y.1996) (citing *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988)); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993). Courts must act with caution in granting summary judgment. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

■ Summary judgment requires development of an adequate factual basis. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *supra,* § 2725, at 85. Denial of summary judgment is, however, inappropriate if the factual issues are settled but the case involves a difficult question of law. *See, e.g., Sagers v. Yellow Freight System, Inc.,* 529 F.2d 721, 728 n. 13 (5th Cir.1976); *Schwartzberg v. Califano,* 480 F.Supp. 569, 578 (S.D.N.Y.1979); *see also* 10A Wright, Miller & Kane, *supra,* § 2725, at 84–85.

Resolution of new and complex questions of law frequently require concrete and thorough factual development. *See, e.g., American Mfrs. Mut. Ins. Co. v. American Broadcasting–Paramount Theatres, Inc.,* 388 F.2d 272 (2d Cir.1967), *cert. denied,* 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972); *see also* 10A Wright, Miller & Kane, *supra,* § 2725, at 85–89. As one court noted, the denial of summary judgment involves not only pure questions of law, but also the exercise of judicial discretion on the question of whether a final decision on the legal question "should be postponed until it can be founded on a

more complete factual record." *Jecies v. Matsuda,* 503 F.Supp. 580 (S.D.N.Y.1980) (citing *Virgil v. Time, Inc.,* 527 F.2d 1122 (9th Cir.) *cert. denied,* 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1975)).

Courts are particularly reluctant to grant summary judgment in negligence cases. *See* 10A Wright, Miller & Kane, *supra,* § 2729, at 194–97 (citing two studies demonstrating rarity of application of summary judgment in negligence). The existence of nonexistence of negligence is determined by the "jury's application of a 'reasonable man standard,' and therefore, some genuine issues of fact almost always are presented." *Mertens v. Agway, Inc.,* 278 F.Supp. 95, 99 (S.D.N.Y. 1967) (citations omitted).

### D. Law Applicable to Collective Liability

The New York State Court of Appeals has been a leading innovator in the field of product liability. As the Court noted in *Bichler v. Eli Lilly & Co.,* 55 N.Y.2d 571, 450 N.Y.S.2d 776, 436 N.E.2d 182 (1982), "[p]roducts liability law cannot be expected to stand still where innocent victims face 'inordinately difficult problems of proof.'" *Bichler,* 55 N.Y.2d at 580–81, 450 N.Y.S.2d at 779, 436 N.E.2d at 185 (quoting *Caprara v. Chrysler Corp.,* 52 N.Y.2d 114, 123, 436 N.Y.S.2d 251, 255, 417 N.E.2d 545, 549 (1981)). New York has been at the forefront of tort law in recognizing theories of collective liability.

■ Four distinct theories of collective liability that relax the traditional "causation-in-fact" requirement of negligence and product liability law have been recognized or expressly adopted in New York: alternative, enterprise, concerted action, and market share. *See Hall v. E.I. DuPont De Nemours & Co.,* 345 F.Supp. 353 (E.D.N.Y.1972) (enterprise, or industry-wide, liability); *Bichler v. Eli Lilly & Co.,* 55 N.Y.2d 571, 450 N.Y.S.2d 776, 436 N.E.2d 182 (1982) (concert of action); *Hymowitz v. Eli Lilly & and Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069, *cert. denied,* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989) (market share).

■ Alternative liability applies "[w]here the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it." *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948); Restatement (Second) of Torts, § 433B(3); *see also Bichler,* 55 N.Y.2d at 580 n. 5, 450 N.Y.S.2d at 780 n. 5, 436 N.E.2d at 186 n. 5. The burden of proof as to causation in such a case is reversed and placed upon each actor to prove that he did not cause the harm. Alternative liability generally requires joining all possible culpable defendants in the action. *See Shackil v. Lederle Laboratories,* 116 N.J. 155, 166, 561 A.2d 511, 516 (1989); *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 602, 163 Cal.Rptr. 132, 139, 607 P.2d 924, 931, *cert. denied,* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980).

■ Enterprise liability is used to hold all manufacturers in a specific industry liable where the individual manufacturer whose product caused the harm cannot be identified and where the industry jointly controlled the risk. *See Hall v. E.I. DuPont De Nemours & Co.,* 345 F.Supp. 353 (E.D.N.Y.1972); *see also Bichler,* 55 N.Y.2d at 580 n. 5, 450 N.Y.S.2d at 780 n. 5, 436 N.E.2d at 186 n. 5. This joint control usually involves the use of a trade association or other form of agreement or custom through which industry-wide practices or safety standards are determined. *See Hall,* 345 F.Supp. at 374.

■ A theory of "concerted action" establishes collective liability where the evidence shows that all defendants had an understanding, express or tacit, to participate in a common plan to commit a tortious act. *See Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069, *cert. denied,* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989); *see also* Restatement (Second) of Torts § 876 (1965). Mere parallel activity is insufficient to establish collective liability under a concerted action theory. *See Hymowitz,* 73 N.Y.2d at 506–07, 541 N.Y.S.2d at 946–47.

In *Bichler,* the Court of Appeals upheld a jury charge allowing recovery under a concerted action theory where "although acting independently, [defendants'] acts ha[d] the effect of substantially encouraging or assist-

ing the wrongful conduct of the other." 55 N.Y.2d at 582–84, 450 N.Y.S.2d at 781–82. As the Court noted, however, it affirmed the charge because counsel failed to adequately preserve the question for review. 55 N.Y.2d at 583–84, 450 N.Y.S.2d at 781–82. The Court did not engage in a thorough consideration of whether New York law would permit the theory of concerted action embodied in the charge. Subsequently, in *Hymowitz*, the Court rejected the more expansive theory of concerted action found in the *Bichler* charge, holding that a common agreement, tacit or otherwise, is necessary to establish liability for concerted action. *Hymowitz*, 73 N.Y.2d at 506–07, 541 N.Y.S.2d at 946–47. The Court of Appeals did not hold that concerted action is not a viable theory under New York law, but only that its requirements were not met in DES cases. *Id.* 73 N.Y.2d at 507–08, 541 N.Y.S.2d at 948.

As the *Hymowitz* decision illustrates, New York law remains dynamic on the issue of collective liability. The Court of Appeals has been willing to adapt basic theories of collective liability to unique circumstances. While rejecting a concerted action theory where there was no common plan, *Hymowitz* adopted a market share theory for liability in DES cases. *See Hymowitz*, 73 N.Y.2d at 508, 541 N.Y.S.2d at 947; *see also Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 163 Cal. Rptr. 132, 607 P.2d 924, *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980). The Court of Appeals noted the defendants' parallel activity, the identical, generic quality of the product across all manufacturers, and the latent injuries it caused as key factors in adopting the theory. 73 N.Y.2d at 508, 541 N.Y.S.2d at 947.

In adopting market share liability, the court stressed that it was tailoring its market share theory to a unique situation. *See id.* ("We stress, however, that DES is a singular case . . ."). The case demonstrates, however, the Court of Appeals' inclination to fashion new bases of collective liability where the facts and circumstances demand them in protecting the reasonable expectations of safety held by the public. Given the court's history, it would be unwarranted to assume that the New York Court of Appeals would not adopt

or modify New York tort theory in response to new circumstances that warrant such treatment. *See* Christopher J. McGuire, Note, *Market–Share Liability After Hymowitz and Conley: Exploring the Limits of Judicial Power*, 24 U.Mich.L.Ref. 759, 761 (1991) (market share theory may not be limited to DES but instead encompasses a particular set of defendant identification problems).

The New York Court of Appeals continues to break new ground and refine the state's products liability law. *See, e.g., Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995) (implied warranty is a separate and distinct cause of action from design and manufacturing defect).

In addition to these four theories that the New York Court of Appeals has either adopted or acknowledged, appellate courts in other states have adopted other variants of collective liability. *See, e.g., Shackil v. Lederle Laboratories*, 219 N.J.Super. 601, 530 A.2d 1287 (App.Div.1987), *rev'd*, 116 N.J. 155, 561 A.2d 511 (1989) (risk-modified market share liability); *Collins v. Eli Lilly & Co.*, 116 Wis.2d 166, 342 N.W.2d 37, *cert. denied*, 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984) (modified market share liability); *Martin v. Abbott Laboratories*, 102 Wash.2d 581, 689 P.2d 368 (1984) (same); *see also* McGuire, Note, *supra* at 765–67 (discussing *Collins* and *Martin*); Andrew M. Nace, Note, *Market Share Liability: A Current Assessment of a Decade–Old Doctrine*, 44 Vand.L.Rev. 395, 407–12 (discussing *Collins, Martin*, and other variants).

For example, a New Jersey superior court applied what it called "risk-modified market share liability" in a case involving the diphtheria, pertussis, and tetanus ("DPT") vaccine. *See Shackil v. Lederle Laboratories*, 219 N.J.Super. 601, 530 A.2d 1287 (App.Div. 1987), *rev'd*, 116 N.J. 155, 561 A.2d 511 (1989). Under this theory, a defendant's liability for its market share is reduced not only through exculpation, but by a showing that, to the extent the product at issue is not—unlike DES—fungible or generic, its product created a reduced risk relative to its market share. *See id.* The New Jersey Supreme Court reversed not for doctrinal reasons but

on the grounds that imposition of collective liability in that case would frustrate "overarching public-policy and public-health considerations" by threatening the vaccine's availability, and because an adequate statutory scheme of compensation for victims was already in place. 116 N.J. at 158, 561 A.2d at 512. The Court explicitly left open the possibility that it might adopt the theory in another case. 116 N.J. at 189, 561 A.2d at 528 ("This case, the Court's first exposure to market-share liability, may therefore come to represent the exception rather than the rule.").

As *Hymowitz* illustrates, New York has looked to other states for collective liability theories that best fit particular cases where no theory previously adopted in New York was deemed suitable. *See Hymowitz,* 73 N.Y.2d at 508–12, 541 N.Y.S.2d at 948–50 (reviewing decisions of other state courts in crafting New York's market share theory).

A number of factors are common to all theories of collective liability. First, problems unique to the case must make it impracticable to prove which defendant caused the injury. *See Hymowitz,* 73 N.Y.2d at 504–07, 541 N.Y.S.2d at 945–47; *see generally* Symposium: The Problem of the Indeterminate Defendant: Market Share and Non–Market Share Liability, 55 Brooklyn L.Rev. 863 (1989); *see also* David Leebron, *An Introduction to Products Liability: Origins, Issues and Trends,* 1990 Ann.Surv.Am.L. 390, 428–32. Second, all defendants sought to be held collectively liable must have engaged in tortious activity that could have caused the injury. *See Sheffield v. Eli Lilly & Co.,* 144 Cal.App.3d 583, 599, 192 Cal.Rptr. 870, 880 (1983) (rejecting market share liability in manufacturing defect case because it would be unfair to hold innocent manufacturers liable for an injury caused by one tortfeasor). Third, the problems of proof must be related to the conduct (or the product) itself. *See Hymowitz,* 73 N.Y.2d at 507, 541 N.Y.S.2d at 947 (noting necessity for market-share because DES' latency and generic quality creates "curtain" behind which manufacturers otherwise could hide); *Sheffield,* 144 Cal. App.3d at 594, 192 Cal.Rptr. at 877 (delay in discovering alleged causation not related to

nature of product or act or omission of nontortfeasor defendants). Finally, an important consideration in adopting theories of collective liability has been the absence of another effective remedy or procedure through which individual victims may be compensated. *See, e.g., Shackil,* 116 N.J. at 180–86, 561 A.2d at 523–27 (rejecting risk-modified market share theory because statute provides victim compensation).

At bottom, adoption by a state's highest court of a theory of collective liability is a policy decision. As the *Hymowitz* court noted:

> [I]t would be inconsistent with the reasonable expectations of a modern society to say to these plaintiffs that because of the [unique factors identified in the case] the cost of injury should be borne by the innocent and not the wrongdoers.... Consequently, the ever-evolving dictates of justice and fairness, which are at the heart of our common law system, require formation of a remedy....

73 N.Y.2d at 507, 541 N.Y.S.2d at 947; *see also Shackil,* 116 N.J. at 158, 561 A.2d at 512 (public-policy and public-health considerations). In predicting what the New York Court of Appeals would do in the area of collective liability for negligent marketing of handguns, a federal court must look both to developed precedent and to underlying policy considerations that have motivated the state.

### E. Application of Law to Facts

Collective liability provides both a basis for establishing a defendant's liability where proof of causation is impossible and a method of apportioning damages between liable codefendants. It is not necessary to consider here how the New York Court of Appeals would apportion damages if it were to apply a theory of collective liability in this case. Instead, the question posed on this motion for summary judgment is whether it is clear that the Court of Appeals would deny plaintiffs the chance to hold defendants liable under any collective liability theory.

██ Plaintiffs are proceeding on a theory of negligence concerning the manner in which defendants marketed the handguns. Discovery in the present case has thus far

proceeded on the limited question of collective liability, but not on the underlying negligence claim. Until discovery on that point is completed, it is difficult to determine what activity or nonactivity plaintiffs will identify as negligent. Summary judgment on this theory is not appropriate until general discovery is complete and the issues are fully briefed.

It is also difficult to know what the basis will be of the alleged collective liability until the underlying negligence theory is fleshed out. It is nevertheless possible to determine that sufficient questions of material fact exist at this stage, or may likely be developed in further discovery, to deny summary judgment on the collective liability issue.

The heart of the plaintiffs' theory, apparently, is the claim that defendants' negligence in methods of marketing handguns and flooding the handgun market has fostered the development of an extensive underground economy in handguns. Through this underground market, it is suggested, youths may readily illegally obtain handguns which they then use, resulting in the deaths of individuals such as the decedents represented by the plaintiffs in this court.

No one doubts that the problem of youths and handguns is a serious one. As one observer has commented:

> Part of the problem ... [is] the sheer availability of guns. Young people in our inner cities know that there is a war going on; millions have been caught up in the many small battles that make up the war on America's streets. Most young people are interested in surviving the war, but the price they pay is being prepared to kill or be killed almost every day.
>
> As the number of guns available has increased so have the odds that they will be shot in a confrontation.

Geoffrey Canada, *Fist Stick Knife Gun: A Personal History of Violence in America* 68 (1995). As already indicated in Part I, *supra*, the problem of youths and firearms is widely acknowledged to be of major national concern. The Justice Department reports that weapons offenses arrest rates for teenage males have increased dramatically in comparison with the population at large, and

that 23% of those arrested for weapons offenses in 1993 were under the age of 18. *See* Bureau of Justice Statistics, Selected Findings: Weapons Offenses and Offenders 3 (Nov. 12, 1995). Juvenile arrests for weapons offenses increased 100% between 1985 and 1993. *Id.*

Viewing the facts and drawing inferences in the light most favorable to the plaintiffs, it is possible that plaintiffs will be able to show that a substantial cause for the killings that are at the heart of this suit is the operation of a large-scale underground market. No one claims that defendants *intended* their guns to be used illegally to hurt anyone. There may, however, come a point that the market is so flooded with handguns sold without adequate concern over the channels of distribution and possession, that they become a generic hazard to the community as a whole because of the high probability that these weapons will fall into the hands of criminals or minors prohibited from possession under state and federal law. *But see* Note, *Handguns and Products Liability*, 97 Harv.L.Rev. 1912, 1920–24 (1984) (opposing "defect in distribution" theory as basis for strict liability for handgun manufacturers). While in individual cases the exact manufacturer may be identified, plaintiffs might establish through discovery that a particular manufacturer's negligence alone would have been insufficient to foster the growth of the underground gun market to the extent that the individual shooter could obtain that manufacturer's gun. Thus, it may be argued, only the collective action of the handgun industry makes the individual shootings giving rise to this suit possible even when the manufacturer of the gun used in the shooting was known.

Plaintiffs have already produced some material through discovery that hints at support for such a theory. The SAAMI pledge adopted by many defendants, and the meaning given to that pledge by individual representatives of several of the defendants, arguably suggests a collective view within the industry that responsible sales meant only that sales to dealers had to comply with federal law, i.e., were restricted to those with licenses from the federal government.

If the underlying cause of the injuries is the unchecked growth of the underground handgun market, and not an individual negligent sale of a particular gun by a particular defendant to a particular licensed dealer, then the New York Court of Appeals might find a market share theory or some variant to be viable even if the manufacturer of the gun used to commit the killing were known. The New York Court of Appeals well might, for policy reasons, adopt a *Hymowitz*-type theory, or one of the theories espoused by other state courts such as those in *Sindell* or *Shackil* that would allow for exculpation or adjustments for risk contribution at variance with actual market share. *See Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069, *cert. denied*, 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989) (no exculpation); *Shackil v. Lederle Laboratories*, 219 N.J.Super. 601, 530 A.2d 1287 (App. Div.1987), *rev'd*, 116 N.J. 155, 561 A.2d 511 (1989) (modification for risk contribution); *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 602, 163 Cal.Rptr. 132, 139, 607 P.2d 924, 931, *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980) (allowing exculpation).

If negligence lies not in the creation and fostering of the underground gun market, but in the individual sale of a handgun, market share liability might still be a viable theory where the defendant is unknown. It is the nature of illegal handgun use that the shooter is likely to dispose of the gun so as to minimize the chances of being caught. Depending upon what is available to law enforcement investigators where the gun is not retrieved, it will be possible only in some instances, and then to varying degrees, to narrow the field of possible handgun manufacturers. On much different facts and for different reasons than those in the DES cases, difficulties in defendant identification unique to the product and to manufacturer may arise. The New York Court of Appeals might choose to adopt, for reasons of public policy, a theory of collective liability. Most appropriate might be a form of market share liability that provided for exculpation.

It does not appear that the New York Court of Appeals would make use of either concerted activity or enterprise liability theories. The former, as *Hymowitz* makes clear, requires evidence of a tacit agreement as to the tortious conduct. *Hymowitz*, 73 N.Y.2d at 506–07, 541 N.Y.S.2d at 946–47. Plaintiffs have not produced any facts suggesting the existence of an agreement among the defendants as to how to market the guns. The latter theory requires joint control of the risk through use of a trade association or some other method of standard-setting. Plaintiffs allege joint coordination of policy positions, but that relates to lobbying activities, not to actual marketing. Given the facts as thus far developed, the theories the New York Court of Appeals would most likely adopt, if it were to adopt any, are some form of either market share or alternative liability.

As the foregoing discussion illustrates, it would be premature to conclude that the New York Court of Appeals would decline to adopt any theory of collective liability in this case. Many of the elements the Court of Appeals relied upon in *Hymowitz* may be present in this case, some by analogy. Further factual development is required before a court can decide whether plaintiffs may maintain an action predicated on collective liability. *See American Mfrs. Mut. Ins. Co. v. American Broadcasting–Paramount Theatres, Inc.*, 388 F.2d 272 (2d Cir.1967), *cert. denied*, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972); *Jecies v. Matsuda*, 503 F.Supp. 580 (S.D.N.Y.1980).

## VII. Class Action Certification

Plaintiffs seek certification of a class under Rule 23(c)(4)(A) of the Federal Rules of Civil Procedure. That class would consist of persons killed or injured in unlawful handgun shootings and the representatives of such persons.

### A. Requirements

The underlying purpose of the class action mechanism is to foster "judicial economy and efficiency by adjudicating, to the extent possible, issues that affect many similarly situated persons." *In re Joint Eastern and Southern District Asbestos Litig.*, 129 B.R. 710, 802 (citing *Califano v. Yamasaki*, 442 U.S. 682, 700–01, 99 S.Ct. 2545, 2557–58, 61 L.Ed.2d 176 (1979)). It is

universally recognized that in pursuing these goals a district court is afforded broad discretion in determining whether an action should be certified under Rule 23. *See, e.g., City of New York v. International Pipe & Ceramics Corp.,* 410 F.2d 295, 298 (2d Cir. 1969); *In re Joint E. & S. Asbestos Litig.,* 129 B.R. at 816 (E. & S.D.N.Y.1991); *In re Tetracycline Cases,* 107 F.R.D. 719, 735 (W.D.Mo.1985) (citing cases and treatises); 7A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 1759, at 111 (2d ed. 1986).

For a plaintiff-class action to be maintained, four prerequisites must be met: numerosity such that joinder is impractical, common questions of law or fact, typicality of claims or defenses, and the extent to which plaintiffs are representative of the class. *See* Fed.R.Civ.P. Rule 23(a). In addition to these prerequisites, Rule 23(b) provides a choice of additional criteria, one of which must be applicable for a court to certify a class. *See* Fed.R.Civ.P. Rule 23(b). Most relevant of the criteria under 23(b) is that the court may certify a class if it finds that common questions of law or fact predominate over questions affecting individual members. Fed.R.Civ.P. Rule 23(b)(3).

Rule 23(c)(4) provides that "[w]hen appropriate (A) an action may be brought or maintained as a class action with respect to particular issues...." Fed.R.Civ.P. Rule 23(c)(4)(A). Certification is not appropriate if, despite the presence of a common issue, certification would not make the case more manageable or serve the varied interests Rule 23 seeks to advance.

### B. Application

 Plaintiffs propose certification as a class persons killed or injured in unlawful handgun shootings and representatives of such persons. They propose class resolution of issues regarding the joint conduct or concerted action of the defendants in marketing the handguns. They have not demonstrated that all the prerequisites have been met to permit class certification, or that interests of judicial economy and efficiency would be served by certification. Proposed classmembers stand in different positions relative to defendants' conduct.

Plaintiffs argue that issues involving joint conduct will be the same for all members of the proposed class. Whether that joint conduct caused each classmember's injury, however, is another matter. In effect they propose class certification for the questions of duty and breach under negligence, and individual treatment for causation and damages. Courts often bifurcate the liability and damages portions of litigation. *See, e.g., In re Joint E. & S. Asbestos Litig.,* 878 F.Supp. 473, 489–90 (E. & S.D.N.Y.1995); *In re Tetracycline Cases,* 107 F.R.D. at 735.

It makes little sense to bifurcate in this case. Establishing that defendants jointly breached a duty to plaintiffs in the manner the guns were marketed can be just as easily accomplished through consolidation of a small number of cases with similar fact patterns for determination of legal issues. When there are scientific issues of general causation, as in mass torts cases, certification of a class for a limited purpose may be desirable. There are no equivalent causal issues in the instant case.

Assuming that plaintiffs can prove at trial that defendants collectively breached a duty, they must still establish that this breach caused each plaintiff's injury. Many proposed classmembers may be injured through the illegal use of firearms by underage assailants, yet it would seem that plaintiffs must at least tie the youth's possession of the gun to the operation of the underground handgun market attributable to the defendants' mode of marketing. There has been no showing to date that resolution of the issues sought for class certification would advance the interests of judicial economy and efficiency. Certification is denied with leave to renew.

### VIII. Conclusion

Defendants' motion for summary judgment dismissing plaintiffs' product liability and fraud claims is granted. Defendants' motion for summary judgment on plaintiffs' theory of collective liability for negligence is denied. The parties may renew motions upon the

completion of full discovery. Plaintiffs' application for class certification is denied.

SO ORDERED.